**AMERICAN GAS ASSOCIATION, et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**The Independent Oil & Gas Association, et al., Intervenors.**

Nos. 87–1588, 87–1336 to 87–1346, 87–1595, 87–1604, 87–1613, 87–1614, 87–1638, 87–1649, 87–1650, 87–1652, 87–1655, 87–1667, 87–1678, 87–1710, 87–1732, 87–1763, 87–1766 to 87–1768, 87–1772 and 87–1773.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1989.

Decided Oct. 16, 1989.

As Amended Jan. 5, 1990.

Raymond N. Shibley, Washington, D.C., with whom David J. Muchow and Roger B. Cooper, Arlington, Va., for American Gas Association; Daniel F. Collins and William W. Brackett, Washington, D.C., for ANR Pipeline Company and Colorado Interstate Gas Company; John H. Cheatham III, for Interstate Natural Gas Association of America; Kevin J. Lipson, John E. Holtzinger, Jr., Charles C. Thebaud, Jr., Washington, D.C., and Stephen E. Williams for CNG Transmission Corporation; Terence J. Collins, Washington, D.C., Margaret L. Bollinger, Houston, Tex., and Robert H. Benna, Washington, D.C., for Tennessee Gas Pipeline Company; Robert T. Hall, III, New York City, and Stephen L. Huntoon for Williston Basin Interstate Pipeline Company; William J. Grealis, Dana B. Ott, Washington, D.C., and Cheryl M. Foley, Houston, Tex., for Transwestern Pipeline Company; John F. Harrington, Birmingham, Mich., for Texas Gas Transmission Corp.; Michael R. Waller, Washington, D.C., for United Gas Pipe Line Company; and Michael E. Small, Washington, D.C., for Williams Natural Gas Company were on the joint brief for Pipeline Group in 87–1588, et al.

Jennifer N. Waters with whom Frederick Moring, Washington, D.C., for Associated Gas Distributors; William T. Miller, Susan N. Kelly and Mark C. Darrell, Washington, D.C., for American Public Gas Association; Roberta L. Halladay, Washington, D.C., Marilyn A. Specht and C. William Cooper, for United Distribution Companies; Richard A. Solomon and David D'Alessandro, Pittsburgh, Pa., for The Public Service Commission, State of New York; Lynne H. Church and Robert Fleishman and Jeffrey D. Watkiss, Washington, D.C., for Baltimore Gas and Electric Company; Robert B. Langstaff, for Board of Water Gas & Light Commissioners, Albany, Georgia; William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, Brooklyn, N.Y., for Consolidated Edison Company of New York; Kenneth J. Neiss, for Laclede Gas Company; John M. Glynn for Maryland People's Counsel; Frank J. Kelley, Detroit, Mich., Louis J. Caruso, Don L. Keskey, Henry J. Boynton, Lansing, Mich., Patricia S. Barone, Murphysboro, Ill., Ronald D. Eastman and Lynda S. Mounts, Washington, D.C., for The State of Michigan and Michigan Public Service Commission; Glen W. Letham and Kenneth M. Albert, Washington, D.C., for Memphis Light, Gas & Water Division; Charles F. Wheatley, Jr., Philip B. Malter for National Association of Gas Consumers; Harry H. Voight and M. Reamy Ancarrow, Washington, D.C., for Niagara Mohawk Power Corporation, and Orange and Rockland Utilities, Inc.; David I. Bloom, Washington, D.C., for Northern Illinois Gas Company; Margaret Ann Samuels, Columbus, Ohio, for Office of the Consumers' Counsel, State of Ohio; William I. Harkaway, Washington, D.C., and C. Burnett Dunn, for Oklahoma Natural Gas Transmission Company; Steven F. Greenwald, Joshua Bar–Lev and Lindsey How–Downing, San Francisco, Cal., for Pacific Gas & Electric Com-

pany; James R. Lacey, for Public Service Electric & Gas Company; Janice E. Kerr, J. Calvin Simpson, and Michael B. Day, San Francisco, Cal., for The Public Utilities Commission of The State of California; E.R. Island and David L. Huard, Los Angeles, Cal., for Southern California Gas Company; Frank H. Strickler, Gordon M. Grant, Washington, D.C., and Ralph E. Fisher for Washington Gas Light Company; Veronica Smith for Pennsylvania Public Utility Commission; James Hinchliff, Chicago, Ill., Thomas M. Patrick, Mark J. McGuire, and Karen Lee for The Peoples Gas Light & Coke Company and North Shore Gas Company were on the joint brief for Local Distribution Companies, state commissions and related agencies in 87–1588, et al.

Thomas G. Johnson with whom Charles J. McClees, Jr. and James A. Ruoff, Houston, Tex., for Shell Offshore, Inc. and Shell Western E & P Inc.; Jack M. Wilhelm, Amoco Production Co.; R. Gordon Gooch, Washington, D.C., and F. Nan Wagoner, Houston, Tex., for Anadocko Petroleum Corp.; Richard G. Morgan for Apache Corp.; Harris S. Wood and Kathleen E. Magruder, Houston, Tex., for Arco Oil and Gas Company; David J. Evans, and James B. Atkin, San Francisco, Cal., for Chevron USA Inc.; Ernest J. Altgelt, III, Houston, Tex., for Conoco, Inc.; C. Roger Hoffman and D.W. Rasch, Houston, Tex., for Exxon Corporation; Toni D. Hennike, Dallas, Tex., and Gerald M. Bendo, Tulsa, Okl., for Hunt Oil Company; John J. Akins, Oklahoma City, Okl., for Kerr–McGee Corporation; Robert C. Murray, New York City, for Marathon Oil Company; R. Brent Harshman for Maxus Energy Corp.; Paul F. O'Konski and Randolph C. Bruton for Meridian Oil, Inc.; Jay G. Martin, Houston, Tex., for Mobil Natural Gas Inc., and Mobil Oil Exploration & Producing Southeast, Inc.; John B. Chapman, El Paso, Tex., for Pennzoil Company; Michael L. Pate for Oxy USA, Inc.; John L. Williford, Bartlesville, Okl., Larry Pain and Luke A. Mickum, Oklahoma City, Okl., for Phillips Petroleum Co. and Phillips 66 Natural Gas Co.; Ronald D. Hurst, for Placid Oil Company; Ralph J. Pearson, Jr., Austin, Tex., and David B. Lindberg for Texaco, Inc.; Kenneth L. Riedman, Jr., Los Angeles, Cal., for Union Oil Company of California; and Kerry R. Brittain and Alan W. Tomme, Midland, Tex., for Union Pacific Resources Company were on the joint brief for Producers Group in 87–1588, et al.

William W. Brackett with whom Daniel F. Collins, Washington, D.C., ANR Pipeline Company and Colorado Interstate Gas Company; Steven E. Williams, Kevin J. Lipson, John E. Holtzinger and Charles C. Thebaud, Jr., for CNG Transmission Corporation, Michael R. Waller, Washington, D.C., for United Gas Pipe Line Company, and Robert T. Hall, III, New York City, and Stephen L. Huntoon, Washington, D.C., for Williston Basin Interstate Pipeline Company were on the joint brief for Pipeline Group, in the Take-or-Pay and Contract Demand Issues in 87–1588, et al.

Robert H. Benna with whom John T. Ketcham, David D. Withnell, Washington, D.C., and Margaret L. Bollinger, Houston, Tex., were on the brief for Tennessee Gas, on the Take-or-Pay and Contract Demand Issues in 87–1588, et al.

Edward B. Myers also entered an appearance for petitioner Interstate Natural Gas Association of America.

Dale A. Wright and Michael E. Small, Washington, D.C., entered appearances for petitioners Williams Natural Gas Co., Northwest Pipeline Corp.

Charles M. Darling, IV and Stephen L. Teichler, Washington, D.C., entered an appearance for petitioner Ashland Exploration, Inc., Cabot Corp.

Robert T. Hall, III, New York City, and Stephen L. Huntoon, Washington, D.C., entered appearances for petitioner Williston Basin Interstate Pipeline Co.

Jerome M. Feit, Solicitor, FERC, Washington, D.C., with whom Catherine C. Cook, General Counsel, Dwight C. Alpern, Detroit, Mich., and Joel M. Cockrell, Washington, D.C., attorneys, FERC, were on the brief for respondent in 87–1588, et al., John Estes, Joseph Davies, attorneys, FERC, also entered appearances for respondent.

Edward J. Grenier, Jr. with whom William H. Penniman, James M. Bushee, Washington, D.C., for Process Gas Consumers Group, American Iron and Steel Institute and Georgia Industrial Group and Robert F. Shapiro and Thomas E. Hirsch, III, Washington, D.C., for American Paper Institute, Inc., were on the joint brief for intervenors Industrial End Users Group in 87–1588, et al.

George L. Weber and Kenneth L. Glich, for National Fuel Gas Supply Corporation; Stephen J. Small, Boston, Mass., Mark D. Clark, John H. Pickering, Timothy N. Black, Neal T. Kilminster, and Susan D. McAndrew, Washington, D.C., for Columbia Gas Transmission Corp.; and Ronald N. Carroll, for Inland Gas Company, Inc. were on the joint brief for intervenors on Contract Demand Reduction Issues in 87–1588, et al.

Norma K. Scogin, Assistant Attorney General, State of Texas, Austin, Tex., was on the joint brief for intervenors Railroad Commission of Texas, Corporation Commission of the State of Kansas, and State of Louisiana in 87–1588, et al.

Richard G. Morgan and Brian T. O'Reilly entered an appearance for intervenor American Gas, et al.

Rigdon H. Boykin, New York City, and Thomas E. Hirsch, III, Washington, D.C., entered appearances for intervenor The American Paper Institute, Inc.

William T. Miller, Susan N. Kelly and Mark C. Darrell, Washington, D.C., entered appearances for intervenor American Public Gas Association.

Jon L. Brunenkant, Kevin M. Sweeney, Washington, D.C., and Jack M. Wilhelm entered appearances for intervenor Amoco Production Co.

Gordon Gooch, Katherine Edwards, Washington, D.C., Dennis Moss and Dan A. Spencer, Spring, Tex., entered appearances for intervenor Anadocko Petroleum Corp.

Richard G. Morgan entered an appearance for intervenor Apache Corporation.

Harris S. Wood, Norma J. Rasner and Kathleen E. Magruder, Houston, Tex., entered appearances for intervenor ARCO Oil and Gas Co.

Joel L. Greene and Barbara S. Jost, Washington, D.C., entered appearances for intervenors Arizona Public Service Co., et al.

Ivy Lincoln entered an appearance for intervenor The Arkansas Public Service Commission.

Frederick Moring, M. Lisanne Crowley and Jennifer N. Waters, Washington, D.C., also entered appearances for intervenor Associated Gas Distributors.

Robert Fleishman, Lynne H. Church and Jeffrey D. Watkiss, Washington, D.C., entered appearances for intervenor Baltimore Gas and Electric Co.

John W. Glendening, Jr. and Bruce B. Glendening, Washington, D.C., entered appearances for intervenors Bay State Gas Co., et al.

Patricia A. Curran, Houston, Tex., also entered an appearance for intervenor Cabot Corporation.

Robert B. Langstaff, Albany, Ga., entered an appearance for intervenor City of Albany, Georgia Board of Water, Gas and Light Commissioners.

Richard I. Chaifetz, Washington, D.C., entered an appearance for intervenor City of Willcox, Arizona, et al.

John L. Shailer and Roger C. Post, Columbus, Ohio, entered appearances for intervenor Columbia Gas Distribution Co.

Stephen J. Small, Boston, Mass., Giles D. Snyder and Ronald N. Carroll also entered appearances for intervenor Columbia Gas Transmission Corp.

Ernest J. Altgelt, III, Houston, Tex., entered an appearance for intervenor Conoco, Inc.

William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, Brooklyn, New York, also entered appearances for intervenor Consolidated Edison Co. of N.Y., Inc.

John E. Holtzinger, Jr. and Robin Taylor Wiggins, Washington, D.C., also entered appearances for intervenor Consolidated Gas Transmission Corp.

Donald J. MacIver, Jr., Richard Owen Baish, Scott D. Fobes, El Paso, Tex., and Richard C. Green also entered appearances for intervenor El Paso Natural Gas Co.

Dennis D. Ahlers entered an appearance for intervenor Energy Issues Intervention Office of the Minnesota Department of Public Service.

C. Roger Hoffman, Joseph G. Stiles, D.W. Rasch, Houston, Tex., Charles M. Darling IV, Stephen L. Teichler and Sheryl S. Hendrickson, Washington, D.C., also entered appearances for intervenor Exxon Corp.

Stephen A. Herman, Newark, N.J., entered an appearance for intervenor The Fertilizer Institute.

Charles H. Shoneman, Washington, D.C., entered an appearance for intervenor The Independent Oil & Gas Association of West Virginia.

Robert C. Platt entered an appearance for intervenor Independent Petroleum Association of America, et al.

Kenneth J. Neises, Washington, D.C., entered an appearance for intervenor Laclede Gas Co.

Kevin M. Sweeney, Washington, D.C., entered an appearance for intervenor Marathon Oil Co.

Thomas C. Gorak, Washington, D.C., and John M. Glynn, Baltimore, Md., entered appearances for intervenor Maryland People's Counsel.

Glenn W. Letham and Kenneth M. Albert, Washington, D.C., also entered appearances for intervenor Memphis Light Gas & Water Division.

Jeffrey M. Petrash, Washington, D.C., and James H. Holt also entered appearances for intervenor Michigan Consolidated Gas Co.

Jay G. Martin, Houston, Tex., entered an appearance for intervenor Mobil Natural Gas Inc.

Paul E. Goldstein, Paul W. Mallory, Lombard, Ill., and Paul Korman, Washington, D.C., entered appearances for intervenor Natural Gas Pipeline Co. of America.

Harry H. Voigt, M. Reamy Ancarrow and Mindy A. Buren, Washington, D.C., also entered appearances for intervenors Niagara Mohawk Power Corp., Orange and Rockland Utilities, Inc.

David I. Bloom, Washington, D.C., also entered an appearance for intervenor Northern Illinois Gas Co.

James T. McManus and Stephen K. Schroeder, Salt Lake City, Utah, entered appearances for intervenor Northwest Pipeline Corp.

William I. Harkaway, Washington, D.C., and C. Burnett Dunn also entered appearances for intervenors ONG Transmission Co., et al.

Michael L. Pate entered an appearance for intervenor Oxy, USA, Inc.

Joshua Bar–Lev, Steven F. Greenwald, and Lindsey How–Downing, San Francisco, Cal., entered appearances for intervenor Pacific Gas and Electric Co.

Raymond N. Shibley, Brian D. O'Neill and Bruce W. Neely, Washington, D.C., also entered appearances for intervenors Panhandle Eastern Pipe Line Co., et al.

Robert P. Haynes, John F. Povilaitis, Daniel P. Delaney, Harrisburg, Pa., and Veronica Smith entered appearances for intervenor The Pennsylvania Public Utility Commission.

John K. McDonald and Charles E. Suffling also entered appearances for intervenor Pennzoil Co.

Charles L. Pain, Bartlesville, Okl., Jennifer A. Cates, John L. Williford, Luke A. Mickum, Bartlesville, Okl., and Larry Pain also entered appearances for intervenors Phillips Petroleum, et al.

Edward J. Grenier, Jr., William H. Penniman, Glen S. Howard and James M. Bushee, Washington, D.C., also entered appearances for intervenor The Process Gas Consumers Group, et al.

Richard A. Solomon and David A. D'Alessandro, Pittsburgh, Pa., also entered appearances for intervenor The Public Service Commission of the State of New York.

James R. Lacey entered an appearance for intervenor Public Service Electric and Gas Co.

Janice E. Kerr, J. Calvin Simpson and Michael B. Day, San Francisco, Cal., entered appearances for intervenor The Public Utilities Commission of the State of California.

Sarah F. Miller and Norma K. Scogin, Austin, Tex., also entered appearances for intervenor Railroad Commission of Texas.

Carroll L. Gilliam, J. Paul Douglas, Kevin M. Sweeney, Washington, D.C., Craig Harman Walker, Charles J. McClees, Jr., Houston, Tex., and Thomas G. Johnson also entered appearances for intervenors Shell Offshore, Inc. et al.

E.R. Island, Los Angeles, Cal., entered an appearance for intervenor Southern California Gas Co.

R. David Hendrickson and Donna J. Bailey entered appearances for intervenor Southern Natural Gas Co.

Robert Y. Hirasuna, Washington, D.C., entered an appearance for intervenor The State of Louisiana.

John M. Hopper, Jr., Houston, Tex., entered an appearance for intervenor Tejas Power Corp.

Phyllis G. Rainey, Houston, Tex., also entered an appearance for intervenor Tenneco Oil Co.

Harold L. Talisman, Robert H. Benna, David D. Withnell, John T. Ketcham, Terence J. Collins, Washington, D.C., Ernest B. Abbott and Margaret L. Bollinger, Houston, Tex., also entered appearances for intervenor Tennessee Gas Pipeline Co.

Michael J. Manning, James F. Moriarty and James P. White entered appearances for intervenor The Tennessee Small General Service Customer Group.

Ralph J. Peason, Jr. entered an appearance for intervenor Texaco, Inc.

Judy M. Johnson also entered an appearance for intervenor Texas Eastern Transmission Corp.

Ralph E. Simon, Jr., Tulsa, Okl., entered an appearance for intervenor Transok, Inc.

William J. Grealis, Dana B. Ott, Washington, D.C., and Cheryl M. Foley, Houston, Tex., entered appearances for intervenor Transwestern Pipeline Co.

Kerry Brittain entered an appearance for intervenor Union Pacific Resources Co.

F. Nan Wagoner, Houston, Tex., Gordon Gooch, Katherine B. Edwards, Washington, D.C., also entered appearances for intervenor Union Texas Petroleum Corp.

Roberta L. Halladay, Washington, D.C., and C. William Cooper also entered appearances for intervenor United Distribution Companies.

Michael R. Waller, Frederick W. Peters, Washington, D.C., Phillip D. Endom, Houston, Tex., entered appearances for intervenor United Gas Pipe Line Co.

M. Frazier King, Jr. entered an appearance for intervenor Valero Interstate Transmission Co.

Luis M. Guzman entered an appearance for intervenor, Valero Transmission Co., L.P.

Dale A. Wright and Michael E. Small, Washington, D.C., also entered appearances for intervenors Williams Natural Gas Co. and Northwest Pipeline Corp.

Before WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Federal Energy Regulatory Commission embarked in the early 1980s on an ambitious program to restructure the natural gas industry along lines more competitive than it had traditionally followed. One of the major components of this program, the encouragement of natural gas pipelines to adopt an "open access" transportation policy, failed to pass muster when we reviewed it, because the Commission failed to show either that it had authority to impose, or that it could rationalize the imposition of, a few of its components. *Associated Gas Distributors v. FERC*, 824 F.2d 981 (1987) (*AGD*). Because these components were inseparable from the whole, we vacat-

ed and remanded the Commission's Order No. 436 for the agency to cure the defects we had identified. The Commission promptly, in Order No. 500, issued an "interim rule," and undertook to issue a final rule when it had collected and analyzed certain information that it deemed essential.

Numerous natural gas pipeline companies, producers, local distribution companies (LDCs), and industrial end users petitioned for review of the interim rule, and three States (Texas Railroad Commission, Kansas Corporation Commission, and the State of Louisiana) have intervened, in this court. We now hold that the interim rule does not comply with the mandate in *AGD*. Therefore, we retain jurisdiction of this matter and remand the record for the Commission to issue a final rule within 60 days.

## I. BACKGROUND

The background against which the Commission adopted its open-access transportation policy is described in detail in this court's opinion in *AGD*. Therefore, we shall only briefly summarize here those elements relevant to the petitions to review now before us.

### A. *From Order No. 436 to* AGD.

On October 9, 1985, the Federal Energy Regulatory Commission issued Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R.), in an effort to promote competition in the sale of gas to consumers. The Commission had concluded that, notwithstanding increasing competition at the wellhead, pipelines continued to have market power in gas transportation; that they generally refused to transport gas for producers with which they competed in their role as gas merchants; and that this discrimination prevented customers from receiving gas at prevailing market prices. 824 F.2d at 996. It therefore sought to "unbundle" the merchant and transportation roles of the pipelines.

The central feature of Order No. 436 required "a pipeline seek[ing] to take advantage of 'blanket certification' of trans-portation (*i.e.*, a certificate authorizing transportation services generically and thus obviating the need for unwieldy individual certification), [to] commit itself to provide transportation on a nondiscriminatory basis (and thus become an "open-access" pipeline)." *Id.* As we described in *AGD*, the Order also sought to reduce the obligations of LDCs to purchase gas from pipelines:

> Any open-access pipeline, by applying for certification, agrees to allow its LDC customers to convert their "contract demand" ("CD") (*i.e.*, contract commitment to purchase gas) from an obligation to purchase gas to an obligation to use (or pay for) transportation services. The point of the option is to make open access a reality for the pipeline's LDC customers despite long-term contractual service arrangements previously certified by the Commission. The Order also requires an open-access pipeline to give its LDC customers the option to reduce contract demand.

*Id.* The Order did not, however, relieve pipelines from the burden of their take-or-pay contracts with producers, although those contracts generally contain price levels "well above current competitive levels." *Id.*

In *AGD*, we vacated Order No. 436 in its entirety, despite approving much of its substance, because of a few problems that could not be isolated from the overall balance struck by the agency:

> The CD adjustment conditions suffer from a want of both legal authority and reasoned decisionmaking. The problem with the legal authority stems from the Commission's misplaced reliance on § 7(e); the lack of reasoned decisionmaking lies in its failure to trace the path that led it from the statutory authority and the facts to its adoption of the CD reduction option. On remand, FERC is free to attempt to remedy these problems. If, however, it elects to go forward with the Order without CD conversion, it must, of course, explain why it feels that such a condition is no longer necessary.

The Commission's decision not to take any affirmative action to solve the problems posed by the uneconomic producer-pipeline contracts also fails to meet the standards of reasoned decisionmaking. On remand, FERC must more convincingly address the magnitude of the problem and the adverse consequences likely to result from the nondiscriminatory access and CD adjustment conditions. It is not our place to say whether FERC should take measures to shift those losses from where they now lie; we ask only that it explain its course.

*Id.* at 1044.

In particular, we found the Commission's justifications for rejecting two proposed solutions to the take-or-pay problem insufficient. First, the Commission had decided not to take direct action by using its power under § 5 of the Natural Gas Act, 15 U.S.C. § 717d, to set aside jurisdictional contracts with excessive take-or-pay clauses. The Commission believed that such action would be "inequitable and inefficacious" because it would address only jurisdictional contracts. 824 F.2d at 1027. We were unconvinced by this argument because of FERC's failure to indicate "the extent to which contracts for jurisdictional gas account for the basic economic problem." *Id.* at 1028. We therefore ordered the Commission to "reassess its refusal to act under § 5." *Id.* We made it perfectly clear, however, that we were rejecting only the Commission's reasoning, not requiring it to act under § 5. *Id.* at 1028 & n. 31.

We also addressed the Commission's refusal to condition producers' right of access to pipeline transportation services on their helping to solve the take-or-pay crisis, and concluded that the Commission had failed to explain why pipelines should have to provide access to producers that refused to renegotiate unreasonable contracts. We required the Commission either to make the case against, or to consider implementing, some form of access-conditioning with whatever "procedural and substantive limits" might be necessary in order to prevent pipelines from discriminating unduly against some producers and customers. *Id.* at 1028–29. We repeated, however,

that we did "not require that FERC reach any particular conclusion; we merely mandate[d] that it reach its conclusion by reasoned decisionmaking." *Id.* at 1030.

We concluded *AGD* by explaining why we were vacating the entire Order:

The parts of Order No. 436 are interdependent. The nondiscriminatory access and CD adjustment provisions aggravate the pipelines' jeopardy from take-or-pay liability. When coupled with take-or-pay liability, those provisions may bring about a wasteful imbalance between pipeline sales and unbundled transportation service. Thus the Commission's apparent insouciance on take-or-pay taints the package. And CD adjustment, which the Commission has identified as essential to remedying problems deriving from the pipelines' market power, suffers from independent vulnerabilities. Accordingly, we vacate Order No. 436 and remand for further proceedings consistent with this opinion.

*Id.* at 1044.

B. *From* AGD *to the Present.*

In the wake of *AGD*, the Commission concluded that an interim rule was necessary in order to avoid uncertainty and disruption in gas transportation while it adopted a final rule that responded to the court's critique of Order No. 436. Accordingly, on August 7, 1987, the Commission issued Order No. 500, 52 Fed.Reg. 30,334 (1987), which became effective upon this court's issuance, on September 15, 1985, of the *AGD* mandate, 52 Fed.Reg. 35,539 (1987). Order No. 500 readopted most of Order No. 436, but added and deleted various provisions in an effort to respond, on an interim basis, to the *AGD* mandate sufficiently to comply with the standards set forth in *Mid–Tex Electric Cooperative v. FERC*, 822 F.2d 1123 (D.C.Cir.1987).

Order No. 500 contains a new crediting mechanism that the Commission added in order to mitigate any increase in the take-or-pay liability of pipelines that the open-access requirement might cause. The rule requires a producer seeking open-access transportation to agree to credit transport-

ed gas against the transporting pipeline's take-or-pay liability. A pipeline need not show any actual displacement of its own sales in order to get the credit, and it can apply the credit against any take-or-pay obligations it has with the transporting producer, *i.e.*, not just against the particular sales contract that the transportation has displaced.

The crediting requirement of Order No. 500 is subject to several limitations and exceptions. First, a pipeline cannot apply credits against an obligation arising from a contract executed after the issuance of the *AGD* decision, because the Commission believes that by that time pipelines should no longer have been entering into uneconomic contracts. Second, no credits are earned for any liability incurred before January 1, 1986, because pipelines transported little gas under Order No. 436 before that time, so that most liabilities incurred before then could not have been caused by the open-access requirement. Third, pipelines must transport, but do not receive credits for, gas "presently not committed to the pipeline by contract which it previously purchased under a terminated take-or-pay contract and ... gas it released from a contract containing a market-out clause that allows the pipeline to terminate the contract at its discretion." 52 Fed.Reg. at 30,339. These provisions were intended to "encourage producers to agree to the buyout of existing uneconomic take-or-pay contracts and to the inclusion of market-out clauses in existing contracts," and to extend equal treatment to producers that had already done so. *Id.*

Order No. 500 also adopted a policy, based upon an earlier proposed "policy statement" and the comments received thereon, concerning "acceptable passthrough mechanisms" by which pipelines would be allowed, in the context of individual rate proceedings, to recover take-or-pay buyout and buydown costs from their customers. As always, of course, a pipeline may "recover all prudently incurred costs in [its] sales commodity charges." *Id.* at 30,341. Under a newly created alternative approach, however, a pipeline that transports under the open-access regime of Or-

der No. 500 may recover from 25% to 50% of its take-or-pay settlement costs through a fixed charge if it agrees to "absorb," *i.e.*, not to pass through, an equal percentage; it may then attempt to recover the remainder through sales and transportation surcharges. In order to avoid extended hearings, there is a rebuttable presumption that the uncontested buyout and buydown costs of a pipeline that has agreed to some absorption are prudent, and contested settlements are to be approved if there is substantial evidence of their prudence. In order to encourage early settlements, this alternative approach was made subject to a "sunset" provision; the deadline for filing for recovery of settlement costs was originally set at December 31, 1988.

In order to avoid take-or-pay problems from recurring in the future, the Commission adopted another "policy statement" approving, in general, a pipeline's use of a "gas inventory charge" ("GIC") levied "for standing ready to supply gas to sales customers." A pipeline must announce the GIC prior to its acceptance by a customer, and allow the customer to renegotiate, at regular intervals, the level of service it wants. In return for the GIC, the pipeline waives the right to recover by any other method take-or-pay costs accruing after the effective date of Order No. 500.

Although Order No. 500 retained the provision of Order No. 436 that enabled a customer to convert its CD volumes from gas purchases to transportation services, the Commission did decide to drop the CD reduction option (while reserving the possibility of revisiting the subject). Subsequently, it explained that CD reductions made prior to the issuance of Order No. 500 were not meant to be affected by this change. *Interstate Power Co. v. Natural Gas Pipeline Co. of America*, 41 FERC (CCH) ¶ 61,096, at 61,256 (1987), *reh'g denied*, 42 FERC (CCH) ¶ 61,049 (1988).

Noting that "[t]he court [in *AGD* ] directed that the Commission reassess its decision not to invoke its power under NGA section 5 to modify or set aside jurisdictional contracts with troublesome take-or-pay provisions," FERC announced that it was

"undertaking such an inquiry." Accordingly, it requested extensive data from pipelines on their take-or-pay liabilities. Forty-five data requests were served on August 26, 1987, barely a month after *AGD* issued. Pipelines were required to respond within thirty days of the date of the request.

Since issuing Order No. 500, the Commission has modified it several times and extended various deadlines. The first such step came on October 14, 1987, when the Commission extended to November 1, 1987, the deadline for responses to its data request. Order No. 500–A, 52 Fed.Reg. 39,-507.

On October 16, the Commission placed an additional limitation on the crediting scheme. Order No. 500–B, 52 Fed.Reg. 39,630 (1987). Concerned that a pipeline might deny access to gas jointly owned by several parties if any owner refused to credit transported volumes against the pipeline's take-or-pay obligation, the Commission decided that if owners accounting for at least 85% of the volume of gas to be transported agree to the crediting, the pipeline must provide access. The Commission concluded that this adjustment would not significantly reduce, and in some cases would increase, the benefit of crediting to pipelines because it would remove an impediment to open-access transportation, and hence to the receipt of credits against take-or-pay liability.

Order No. 500–C, issued on December 23, added several new exceptions, some relevant here, to the crediting requirement. 52 Fed.Reg. 48,986 (1987). First, a pipeline may not apply credits against an obligation to take casinghead gas, which is produced jointly with oil. The Commission was concerned that if a pipeline did not take all of the casinghead gas that it has committed to take, the producer would have either to stop the accompanying oil production or to flare the gas; either oil production would decline or gas would be wasted. The Commission called for comments on the effect of this exception, including an assessment of how much of the pipelines' take-or-pay liability involves casinghead gas. Second,

in order to avoid reducing the incentive for a producer to develop new gas supplies, a pipeline is required to transport new gas, as defined by the Order, without receiving any credit, and it may not apply any credits earned by transporting other gas against its obligation to take or pay for new gas. Third, an exception to the crediting requirement was created for certain gas transported by both an intrastate pipeline and an interstate pipeline: a producer does not have to credit the interstate pipeline for transporting gas that has been released from a contract between the intrastate pipeline and the producer if the release agreement provides for crediting the intrastate pipeline.

The exceptions for casinghead gas and for gas released by an interstate pipeline were both scheduled to expire on April 1, 1988, apparently because the Commission believed it would promulgate a final rule by that time. On March 8, 1988, however, the Commission announced that it was "not practicable for [it] to issue a final rule in this proceeding by April 1, 1988." Order No. 500–D, 53 Fed.Reg. 7893. The Commission determined that it needed more time in order to consider the extensive comments it had received and to hold a hearing, which it scheduled for April 11–12. It therefore extended the effect of the crediting exceptions until the issuance of a final rule.

Finally, on December 9, 1988, the Commission extended the deadline for use of the fixed-charge passthrough mechanism to March 31, 1989, from December 31, 1988. Order No. 500–F, 53 Fed.Reg. 50,924 (1988), *reh'g denied,* Order No. 500–G, 54 Fed.Reg. 7400 (1989). With regard to a contract in litigation as of March 31, 1989, however, a pipeline may file for recovery of take-or-pay costs whenever the litigation ends.

Since the Commission issued Order No. 500, producers and pipelines have renegotiated a substantial portion of their take-or-pay contracts. By the end of 1987, almost 80% of pipelines' potential liability had been resolved. INGAA, A Comparison of the INGAA and NGSA 1988 Take–or–Pay

Analyses 5 (May 1988). The Producers intervening in support of respondent assert that, by the end of 1988, this figure had risen to 95%, leaving $850 million in outstanding potential liability among twenty-three major pipelines surveyed. NGSA, A Status Report on the Interstate Pipeline Take–or–Pay Situation: Substantial Resolution Through Year–End 1988, at 1 (May 1989). The petitioning Pipelines contend that there was $2.1 billion of such liability outstanding among the 21 pipelines that the INGAA surveyed at the end of March 1989. INGAA, Fact Sheet on Take–or–Pay in 1988: An Interim Report (July 10, 1989). Whatever the precise figures, however, the Pipelines and the Producers agree that the potential outstanding take-or-pay liability has fallen substantially over the last few years.

Meanwhile, the Commission has neither taken action under § 5 of the NGA, explained why it has not done so, nor made public its analysis of the data that it required the pipelines to submit. Nor has the Commission issued a final order to succeed the interim rule of Order No. 500.

## II. THE PETITIONS FOR REVIEW

The various petitioners mount a barrage of challenges to Order No. 500. The Pipelines and the LDCs argue that the Commission has failed to satisfy the standards for interim orders announced by this court in *Mid–Tex.* They assert that Order No. 500 neither responds to the *AGD* mandate generally, nor allows responses on a case-by-case basis. They point to the Commission's failure either to use its § 5 power to abrogate or modify uneconomical take-or-pay contracts, or to explain its decision not to do so. They also contend that the crediting mechanism does not effectively deal with the take-or-pay problem, citing survey evidence that only five per cent of the gas transported in 1988 earned credits. INGAA, Fact Sheet on Take–or–Pay in 1988: An Interim Report (July 10, 1989). They also claim that the Order does not preserve the agency's ability to respond to our mandate in a final rule, and that it has therefore itself become a *de facto* final rule.

The Producers assert that the Commission has provided no basis in authority for requiring them to credit transportation volumes against take-or-pay liability, that it does not have such authority, and that conditioning open access upon crediting is arbitrary and capricious. In particular, they argue that the Commission may not condition access under authority of § 7 of the NGA without running afoul of the *Panhandle* doctrine, as explicated in *Northern Natural Gas Co. v. FERC*, 827 F.2d 779 (1987) (*en banc*), because the terms of the producer-pipeline contracts are not "before" the Commission when a pipeline files for a blanket certificate pursuant to Order No. 500. They argue further that § 311 of the Natural Gas Policy Act, 15 U.S.C. § 3371, does not provide authority for the crediting mechanism because conditioning works against the purpose of that statute to promote reliance upon market forces in pricing gas. The Producers also contend that the crediting mechanism is arbitrary and capricious because it places a condition upon their access to pipelines on the Outer Continental Shelf even though §§ 5(e) and 5(f) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1334(e)-(f), already guarantee them that access.

The Pipelines challenge the Commission's take-or-pay cost passthrough "policy statement." They assert that it is really a firm rule, not a mere statement of policy to be applied in or adapted to particular cases as they arise, and that as such it is now ripe for our review. They also assert that FERC has precluded challenges to specific applications of the policy in two ways. First, FERC has conditioned approval of each individual pipeline's proposed fixed charges upon its agreeing not to contest the validity of the Commission's "absorption" or "equitable sharing" requirement. *See, e.g., Natural Gas Pipeline Co. of America*, 43 F.E.R.C. (CCH) ¶ 61,194, at 61,516 (1988) ("If Natural wants to reserve its right to litigate the rejection of its primary proposal, then that is not an agreement to absorb costs under the alternative mechanism of Order No. 500 and the Commission must reject Natural's alternative tariff sheets as well."), *reh'g denied*, 43

F.E.R.C. (CCH) ¶ 61,341 (1988). Second, by means of the sunset provision, which required pipelines to file applications for a fixed charge before March 31, 1989, the Commission made appeal too risky; if a pipeline loses its appeal of FERC's denial of 100% recovery, it will then be too late to seek a 50% fixed charge.

The Pipelines' substantive contention is that the Commission's passthrough policy illegally denies them a reasonable opportunity to recover all prudently incurred costs. *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168 (D.C.Cir.1987) (*en banc*). A pipeline that elects the fixed-charge alternative must agree to absorb some of its costs without regard to whether they were prudently incurred, and a pipeline that chooses the sales commodity charge has no realistic opportunity to recover its costs because it cannot sell natural gas above the market price.

Tennessee Gas Pipeline Co. argues that the Commission should have retroactively nullified customers' requests for CD reductions, because this court vacated, and the Commission then decided that it did not have adequate support in the record to repromulgate, the provision of Order No. 436 authorizing those reductions. Tennessee Gas asserts that because the Commission failed to engage in the analysis set out by the Supreme Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–08, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), it has not justified its departure from the general rule that judicial mandates have retroactive effect, *National Association of Broadcasters v. FCC*, 554 F.2d 1118, 1130 (D.C. Cir.1976).

Finally, the State Intervenors maintain that the future-looking GIC policy is arbitrary and capricious because customers have no guarantee that gas will be available when they need it, and because there is no mechanism to ensure that pipelines use the money they receive to purchase reserves and future capacity.

## III. COMPLIANCE WITH *AGD*

We see no need to resolve the issue of whether, due to the length of time since the Commission issued it, Order No. 500 has become a *de facto* final rule, such that it should no longer be reviewed under the standards we set in *Mid–Tex* for evaluating an interim rule. Assuming that it is possible to determine when an interim rule achieves practical finality of effect, and to calibrate accordingly the scrutiny with which we review it, the results we reach here would not be affected thereby. By promulgating a sunset provision that has forced rapid settlements under a regime of uncertain validity, and then allowing more than two years to elapse without issuing a reasoned final order, the Commission has not only failed to satisfy the *Mid–Tex* requirement that it address our concerns on an interim basis by preserving its ability in a final rule to remedy any harm done; it has also disregarded the underlying mandate of *AGD* regarding the issuance and the content of a final rule.

The *AGD* mandate was straightforward: it required that the Commission give a reasoned explanation for its decisions to act or not to act in particular ways. We instructed the Commission either to take steps to address the take-or-pay problem, explaining the reasoning behind the mechanism it chose and the reasons for preferring that mechanism over others, or to justify its decision not to take those steps. Nonetheless, during the two years since we decided *AGD*, the Commission has not done so; it has failed to engage in reasoned decisionmaking, either in promulgating an interim rule in Order No. 500, or by issuing a final rule.

### A. *Section 5 Inaction.*

■ In *AGD* we particularly required the Commission to "reassess its refusal to act [against uneconomic contracts] under § 5," and to explain "its reasons for inaction … clearly enough for us to determine the legality of its analysis." 824 F.2d at 1028. The Commission has done nothing that even purports to comply with these requirements. To be sure, when the Com-

mission issued the data request in Order No. 500, it held out this promise of compliance: "The Commission will aggregate the data submitted and analyze it promptly. If the information demonstrates that action under NGA section 5 ... would contribute to solving pipeline take-or-pay problems, the Commission will then consider such action." 52 Fed.Reg. at 30,341. To this day, that is the Commission's last word on the § 5 issue, apart from its order extending the deadline for pipelines to submit the required data.

The Commission does not now argue that it needs any further data upon which to base a reasoned decision. Instead, FERC defends its non-action on the question of its inaction under § 5 by stating, with utmost complacency, that it "has not yet acted in a final manner because what appears to be occurring in a sustained way is 'an equitable sharing of take-or-pay costs among all segments of the industry.'" FERC Brief at 82 (*quoting* Order No. 500, 52 Fed.Reg. at 30,342). If the Commission believes that no § 5 action is necessary, however, its burden is to provide a reasoned basis for that conclusion in a final rule; that burden is not discharged by avoiding the issue whilst time and the workings of its interim rule conspire to moot the issue.

As we said in *Mid–Tex*, "the agency must convince us ... that it is not engaging in dilatory tactics during the interim period," 822 F.2d at 1132. Its half-explained cunctation here convinces of the opposite, and worse, that it delays in order to avoid having to do the analysis that we required in *AGD* until after the take-or-pay problem has disappeared, *i.e.*, until such time as the agency will have accomplished its purpose regardless of whether it can warrant its authority.

## B.  *The Crediting Mechanism.*

■  We now turn to assertions by various petitioners that the Commission lacks authority to promulgate the crediting mechanism of Order No. 500, and that the mechanism is not only arbitrary and capricious, but ineffective to boot.

### 1.  *Section 7 Authority.*

The Commission has clearly failed to support its authority to apply the crediting mechanism to contracts governed by the NGA. Order No. 500 does not even reveal the basis upon which it asserts this power. Only in its brief does FERC rely upon § 7 of the NGA, which gives the Commission "the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C. § 717f(e).

As we have seen, the Producers contend the Commission cannot lawfully base the crediting mechanism upon § 7 because the take-or-pay contracts are not "before" the Commission when it grants a blanket certificate to a pipeline under Order No. 500. *See Northern Natural Gas Co.,* above; *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1133 (D.C.Cir.1979) (FERC may not "compel flow-through of revenues to customers of services not under consideration in that proceeding for certification."). FERC and the LDCs suggest that the access condition differs from the conditions at issue in the cases just cited because they involved an attempt by the Commission to reduce rates that it had already approved. In contrast, they assert, this case does not involve the agency modifying any rates; instead, the Commission is authorizing pipelines to place a condition upon the transportation service under consideration in the proceeding before it. In addition, the LDCs assert that there is a causal "nexus" between the certificate sought and the condition imposed because open access exacerbates the take-or-pay problem.

We decline to resolve this issue now because the Commission has not expressed its reasoning in support of invoking § 7. Counsel for FERC may point to distinctions between this case and others, but the Commission has not explained why, in its view, if indeed that is its view, these differences justify the result in the service of which they are now marshaled. On remand, the

Commission must do so if it would rely upon § 7. If the Commission rests the conditioning mechanism upon authority other than § 7, of course, it must give us its basis for doing that.

## 2. *Section 311 Authority.*

The Commission need not engage in further explanation specifically to support its reliance upon § 311 of the Natural Gas Policy Act with respect to contracts governed by that statute. Section 311(c) states: "Any authorization granted under this section shall be under such terms and conditions as the Commission may prescribe." 15 U.S.C. § 3371(c). As we noted in *AGD*, "the premises of the *Panhandle* doctrine are absent here." 824 F.2d at 1015.

Nevertheless, the Producers claim that the Commission may not invoke § 311 because conditioning access does not promote the NGPA goal of fostering reliance upon the forces of competition. If conditioning access is a necessary part of a scheme that is procompetitive overall, however, then it does not violate the NGPA even if it may seem to be anticompetitive when viewed in isolation.

## 3. *Authority on the OCS.*

The Commission also fails adequately to support its authority to require credits for gas transported on the OCS. In Order No. 509, the Commission interpreted §§ 5(e) and 5(f) of the OCSLA, 43 U.S.C. § 1334(e)–(f), to require open access on that portion of any pipeline lying on the OCS. FERC Stats. & Regs., Regs. Preambles (1982–1987) (CCH) ¶ 30,842 (1988), *reh'g denied*, 46 FERC (CCH) ¶ 61,177 (1989). FERC's only response to the Producers' argument that the Commission cannot make conditional the access that the statute guarantees them is that "[t]here is no basis for interpreting this requirement to bar a regulatory provision (*i.e.*, crediting) that ... is consistent with essentially the same nondiscriminatory requirement in the Commission's open-access regulations." FERC Brief at 36 n. 26.

The Commission's point seems to be that if crediting is consistent with open access as established by regulation, then it is equally consistent with open access as established by statute. This implicit reliance upon the principle of transitivity works only if it is also true that the two sources of open access can be equated; the whole of the Producers' point, however, is that their right of access exists by virtue of a higher, not an equal, authority; thus, it arguably cannot be qualified by the Commission. If, on remand, the Commission determines that the crediting requirements should apply to OCS pipelines, then in order to justify its assertion of power, it must set out a legal theory that is responsive to the Producers' argument.

## 4. *The Casinghead Gas Exception.*

We conclude that the exception to the crediting mechanism for casinghead gas is not the product of reasoned decisionmaking. In Order No. 500–C, the Commission's sole justification for the exemption is that "a pipeline's failure to take casinghead gas would likely require the producer either to shut in the oil production or flare the casinghead gas," resulting either in increased dependence upon foreign oil or in the waste of natural gas. In their applications to rehear Order No. 500–C, the Natural Gas Association, El Paso Natural Gas Co., and Natural Gas Pipeline Co. of America argued that applying credit to a pipeline's obligation to take casinghead gas will have neither of the effects that the Commission fears because the producer can simply sell into the market whatever gas is not purchased by the pipeline. Although this point, if true, would seem to be compelling, the Commission did not even address it in its Order Denying Rehearing, No. 500–E. On remand, the Commission must either justify the exemption in light of this reasoning or, if it cannot, then withdraw it.

## 5. *Conclusion.*

The petitioners' objections to the other exceptions to the crediting mechanism are adequately met in the Commission's orders; we need not elaborate here upon the points and counterpoints in order to accept the

Commission's reasoning. We do not decide, however, whether the mechanism as a whole, given its exceptions and limitations, adequately responds to the mandate of *AGD*. As in that case, the parts of the Order under review are "interdependent," and the gaps in the Commission's reasoning "taint[] the package." 824 F.2d at 1044. Thus, we are unable to say at this time whether the crediting mechanism, in conjunction with the rest of Order No. 500, effectively deals with the concerns we raised in *AGD*.

## C. *Non–Retroactive Withdrawal of CD Reduction.*

■ The Commission has not satisfactorily addressed the claim that it illegally failed to relieve Tennessee Gas Pipeline of the CD reductions for which its customers had opted prior to the decision in *AGD*. Following our vacatur of Order No. 436, based in part upon "the Commission ha[ving] failed to develop an adequate rationale in support of CD reduction," *id.* at 1018, the Commission concluded that it did not have enough support in the record to warrant repromulgating the provision. Nevertheless, it has purported to give effect to those reductions requested prior to our decision, without ever engaging in the analysis that *Huson*, 404 U.S. at 106–08, 92 S.Ct. at 355–56, requires before a court decision may be given prospective-only application. The Commission does not mention the retroactivity issue in Order No. 500, nor even respond in Order No. 500–B to Tennessee Gas Pipeline's request for a rehearing on this issue; the Commission also failed to apply *Huson* when it first announced that its decision not to repromulgate CD reduction should be of prospective effect only, *see Interstate Power Co. v. Natural Gas Pipeline Co. of America*, 41 FERC (CCH) ¶ 61,096, at 61,256 (1987), *reh'g denied*, 42 FERC (CCH) ¶ 61,049 (1988).

FERC argues that this court's order of July 17, 1987, which permitted the Commission to stay the effectiveness of its CD adjustment (*i.e.*, conversion and reduction) provisions, supports its decision here. The order stated: "As we read FERC's proposed Order, all it plans on doing is prospectively staying the CD adjustment provisions. It does not purport to undo elections previously made." *AGD*, No. 85–1811, Mem.Op. at 2 n. 1. That observation does not bear upon the issue before us, however, because it was addressed to a materially different situation. At the time, the Commission had not yet concluded that the CD reduction provision was unsupportable in the record upon which it was ostensibly based, nor decided to drop it rather than to seek such support by reopening that record.

On remand, in order to overcome the presumption that our vacatur of the CD reduction provision is to be applied retroactively, the Commission must consider the three factors identified by the Supreme Court:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which the litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application....

*Huson*, 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted). When engaging in this analysis, the Commission may not rely upon the unsubstantiated assumption that "these customers must have made alternative arrangements for gas supplies." FERC Brief at 77. Weighing the equities under the third prong of the *Huson* test will necessarily require the Commission to consider whether individual customers in fact relied upon Order No. 436 by taking on alternative gas purchase obligations, and if so, whether there is any reason in equity to bind Tennessee Gas Pipeline to a provision that this court vacated and that the Commission was unable to support on the record before it.

IV. THE COST-RECOVERY MECHANISM

We consider next challenges to the time limit for filing to take advantage of the cost-recovery mechanism and to the allocation of take-or-pay costs between pipelines and end-users under Order No. 500.

A. *The Sunset Provision.*

■ The alternative mechanism for recovering take-or-pay costs that the Commission innovated in Order No. 500 was to be available only until December 31, 1988. Order No. 500–F extended that deadline to March 31, 1989. The Commission's only asserted reason for having a "sunset" provision was to encourage the rapid elimination of "the take-or-pay deterrent to competitive natural gas markets." 52 Fed. Reg. at 30,346.

The Commission's reason is not without some weight: if take-or-pay liability impedes the realization of a competitive gas market, then all other things being equal, its elimination is better done sooner rather than later. As usual, however, all other things are not equal: imposition of the sunset provision has contributed greatly to the risk that we sought to avoid in *AGD*, *viz.* that an unlawful (because legally indefensible) rule will have the force of law. The sunset provision has exacerbated the problem because it has forced rapid settlements prior to the issuance of a lawful final rule. By withholding the issuance of a final rule until after the deadline for favorable treatment of settlements under the "interim rule," the Commission has pressured the participants in the natural gas industry to dispose of much of the take-or-pay problem without its ever taking a final, reasoned position on how this should be done. Furthermore, it has done so in a manner that may have been highly prejudicial to the bargaining power of pipelines which, unlike the producers, were facing the deadline.

Since forcing rapid settlements is the Commission's only justification for the sunset provision, and the regime under which later settlements are penalized and early settlements rewarded may yet prove to be unlawful, the effect of the sunset provision is to frustrate the mandate of *AGD*. Accordingly, we conclude that the provision is arbitrary and capricious.

In the unusual circumstances of this case—in which the Commission's dilatoriness in responding to our demand for an adequate statement of reasons raises the real possibility that the Commission long ago concluded that it could not justify its position—any deadline short of judicial review of the final rule in turn raises the prospect that the pipelines will be put under pressure to comply with an unlawful regime. In order to avoid this problem, we hold that the Commission may not impose any deadline upon applications for the cost passthrough mechanism at least until there has been judicial review of the explanation it issues in response to this decision. If the Commission decides to impose a deadline calculated to fall sometime after judicial review, it must justify that deadline sufficiently to overcome our concern that pipelines will still be unable to appeal Commission decisions rejecting their take-or-pay passthrough proposals because review will come after the new filing deadline.

B. *"Equitable Sharing" or Absorption.*

■ Having determined that the sunset provision is arbitrary and capricious and must be stricken, we find that absent the constraint of that deadline, challenges to the substantive aspects of the cost recovery mechanism are not ripe for review.

The ripeness doctrine is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18

L.Ed.2d 681 (1967). Neither the fitness nor the hardship criterion favors review now.

Whether the cost "absorption" requirement of the Commission's "equitable sharing" approach to cost recovery unlawfully denies to pipelines a reasonable opportunity to recover their prudent costs is a nice question, but at this juncture a somewhat abstract one. The policy "does not have an immediate and significant impact upon petitioners," *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 48 (D.C.Cir.1974), none of which is here challenging the Commission's denial of a particular proposed level of recovery. Thus, there is no concrete decision before us, nor any record upon which to evaluate the policy.

In addition, the Commission presented the cost recovery mechanism as a "policy statement," not a definitive rule, and we have no basis upon which to dispute that characterization. There is a strong norm against our reviewing "tentative agency positions," lest the court deny the agency a "full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding"; moreover "judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position." *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 31 (D.C.Cir. 1984); *see also Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C.Cir.1988) ("The central judicial interest in deferring resolution of this question lies in the possibility that if the issue is not adjudicated at this time, it may not require adjudication at all.").

We do not foresee any significant hardship to the parties as the result of our deferring review. The Pipelines have asserted only that the deadline puts them at risk of not getting any recovery at all if they appeal the agency's decision to deny them full recovery. Because we have concluded that the sunset provision is invalid, however, that risk no longer looms. At least until the completion of our review of the Commission's final order, a pipeline that loses on appeal can safely reapply for 50% cost recovery under the Commission's alternative recovery mechanism. Thereafter, a pipeline's ability to reapply will be governed by such conditions as the Commission may impose in the final rule and we may approve as nonarbitrary.

We reject the Pipelines' argument that review is appropriate now so that they will not lose the time value of their eventual recovery. Consideration of that interest would displace the ripeness doctrine quite generally, which we have neither the inclination nor the authority to do. We therefore conclude that review of the cost recovery policy, other than the sunset provision, is premature at this time.

## V. THE GIC POLICY

The Commission issued GIC guidelines, like the cost recovery mechanism, as a policy statement, not a firm rule; as the Commission acknowledges, it has not fully articulated how the GIC will work. The State Intervenors assert that the policy is arbitrary and capricious because it is not clear how a customer will enforce a pipeline's obligation to deliver the gas for which it has paid. Meanwhile, the Pipelines argue that the GIC policy simply replicates the invalid CD reduction provision of Order No. 436, because it allows a customer to reduce its level of firm sales demand. The Commission is apparently dealing with these objections to the policy in individual proceedings, *see, e.g., Transwestern Pipeline Co.*, 43 FERC ¶ 61,240, *reh'g denied in part*, 44 FERC ¶ 61,164 (1988), *appeal docketed*, No. 88–1046 (D.C.Cir.). When it resolves its position, review may be sought by any party aggrieved. Until such time as the GIC policy precipitates a concrete case on a settled record, however, it presents no issue fit for, and imposes no hardship that could be averted by, judicial review.

## VI. CONCLUSION

When the Commission determined that it required further information in order to respond to the mandate of *AGD*, it was not unreasonable to delay issuing a final rule until April 1, 1988, and to put out an interim rule to govern the industry through the

1988 winter heating season. By April 1988, however, it had already been five months (even considering the deadline extension in Order No. 500–A) since the pipelines had responded to the Commission's requests for data, time enough, one would think, for "[t]he Commission [to] aggregate the data submitted and analyze it promptly."

We recognize that the Commission may have been unprepared to deal with the volume of data and comments it received in response to its call. The Commission does not even purport, however, to have been engaged this last one and a half years in analyzing those returns. On the contrary, it appears at some point to have abandoned the effort to produce a final rule, so satisfied is it with the status quo.

There is no reason why the Commission cannot "promptly" do now what it should have done long ago: explain itself or abandon its rule (or any part thereof) as inexplicable. Consequently, we require the Commission to provide a reasoned basis for the problematic aspects of its decisions, which we have discussed above, and to do so in a final rule, within sixty days of this decision. This final rule must also include a reasoned justification for any changes that the Commission may make in the status quo (*i.e.*, Order No. 500 and its *sequelae*) as of the time it issues. If a portion of any proposed final rule is not the "logical outgrowth" of the interim rule or of prior proceedings, *compare NRDC v. Thomas*, 838 F.2d 1224, 1242–43 (D.C.Cir. 1988), the Commission may apply to the court for an extension of time within which to conduct notice and comment proceedings pursuant to a fixed and expedited schedule leading to the issuance of a final rule.

As mentioned, the court retains jurisdiction of this matter and remands the record only.

*It is so ordered.*