912 F.2d 1496
 286 U.S.App.D.C. 142, 115 P.U.R.4th 281
 AMERICAN GAS ASSOCIATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Independent Oil & Gas Association, Northwest Pipeline
Corporation, El Paso Natural Gas Company, Bay State Gas
Company, et al., Tenneco Oil Company, Apache Corporation,
The Pennsylvania Public Utility Commission, City of Albany,
et al., ONG Transmission Company, et al., Public Service
Commission of the State of New York, Mobil Natural Gas,
Inc., Conoco, Inc., Intervenors.
 No. 87-1588.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 8, 1990.
Decided Aug. 24, 1990.
As Amended Aug. 27, 1990.
 
 Raymond N. Shibley, with whom the following were on the joint brief for pipeline petitioners in 87-1588, et al.: Frank R. Lindh, John A. Sieger, and Judy M. Johnson for Panhandle Eastern Pipe Line Co. and Trunkline Gas Co.; John H. Cheatham, III for Interstate Natural Gas Ass'n of America, Inc.; Paul E. Goldstein and Paul W. Mallory for Natural Gas Pipeline Co. of America; Robert H. Benna and Terrence J. Collins for Tennessee Gas Pipeline Co.; Michael R. Waller for United Gas Pipe Line Co.; Michael E. Small for Williams Natural Gas Co.; Daniel F. Collins and William W. Brackett for ANR Pipeline Co. and Colorado Interstate Pipeline Co.; William B. Grealis and Deborah A. MacDonald for Transwestern Pipeline Co.; and Stephen L. Huntoon for Williston Basin Interstate Pipeline Co.
 Jennifer N. Waters, with whom the following were on the joint brief for petitioner state com'n, distribution companies, and related agencies in 87-1588, et al.: Frederick Moring and Toni M. Fine for Associated Gas Distributors; William T. Miller and Susan N. Kelly for American Public Gas Ass'n; Roberta L. Halladay, Marilyn A. Specht, and C. William Cooper for United Distribution Companies; Richard A. Solomon and David D'Alessandro for Public Service Comm'n, State of N.Y.; Lynne H. Church and Robert Fleishman for Baltimore Gas and Electric Co.; Robert B. Langstaff for Board of Water Gas and Light Commissioners, Albany, Ga.; William I. Harkaway, Harvey L. Reiter, Barbara M. Gunther, and Martin J. Bregman for Consolidated Edison Co. of New York, Kansas Power and Light Co., Kansas Public Service, Missouri Public Service, and Peoples Natural Gas Co.
 Harvey L. Reiter, with whom the following were on the joint brief for petitioner distributors, consumers, end-users, state commissions, state agencies, and a natural gas marketer in 87-1588, et al.: William I. Harkaway and Barbara M Gunther for Consolidated Edison Co. of New York, Inc., et al.; John K. Rosenberg and Martin J. Bregman for Kansas Power and Light Co.; William T. Miller and Susan N. Kelly for American Public Gas Ass'n; Joel L. Greene and Barbara S. Jost for Apache Powder Co., et al.; Frederick Moring, Jennifer N. Waters, and Toni M. Fine for Associated Gas Distributors; Joseph P. Stevens for The Brooklyn Union Gas Co.; Donald K. Dankner and Fred J. Killion for Central Hudson Gas and Elec. Corp., et al.; Arnold D. Berkeley, Richard I. Chaifetz, and Howard L. Nelson for City of Willcox, Arizona and Arizona Elec. Power Cooperative, Inc.; Robert J. Hirasuna for Hadson Gas Systems, Inc.; Jennifer N. Waters, Toni M. Fine, and Kenneth J. Neises for Laclede Gas Co.; Jeffrey M. Petrash and Daniel L. Schiffer for Michigan Consolidated Gas Co.; David I. Bloom for Northern Illinois Gas Co.; Margaret Ann Samuels for Office of the Consumers' Counsel, State of Ohio; Edward B. Myers for Orange and Rockland Utilities, Inc.; Edward J. Grenier, Jr. and William H. Penniman for Process Gas Consumers Group, et al.; Stephen F. Greenwald, Lindsey How-Downing, and Patrick G. Golden for Pacific Gas and Elec. Co.; Thomas M. Patrick and Karen Lee for the Peoples Gas Light & Coke Co. and North Shore Gas Co.; Lawrence F. Barth and Veronica A. Smith for Pennsylvania Public Utilities Com'n; Richard A. Solomon and David D'Alessandro for Public Service Com'n, State of N.Y.; Janice E. Kerr, Michael B. Day, Edward W. O'Neill, and Harvey Y. Morris for Public Utilities Com'n of the State of Cal.; E.R. Island and David L. Huard for Southern California Gas Co.; Robert J. Haggerty, Dandrea Lynn Miller, and Robert B. Rice for Southern Union Gas Co.; William I. Harkaway for Southwest Gas Corp.; Frank J. Kelley, Louis J. Caruso, Don L. Keskey, Henry J. Boynton, Patricia S. Barone, Ronald D. Eastman, Lynda S. Mounts, and Joel Kaufman for State of Mich. and Michigan Public Service Com'n; Frederick Moring, Jennifer N. Waters, and Toni M. Fine for United Cities Gas Co.; Roberta L. Halladay, Marilyn A. Specht, and C. William Cooper for United Distribution Companies.
 Thomas G. Johnson, with whom the following were on the joint brief for producer petitioners in 87-1588, et al.: Charles J. McClees, Jr. and James A. Ruoff for Shell Offshore Inc. and Shell Western E & P Inc.; Jack M. Wilhelm for Amoco Production Co.; R. Gordon Gooch for Anadarko Petroleum Co.; Richard G. Morgan for Apache Corp.; Harris S. Wood and Kathleen E. Magruder for Arco Oil and Gas Co.; Gerald P. Thurmond and David J. Evans for Chevron U.S.A. Inc.; Ernest J. Altegelt, III for Conoco, Inc.; C. Roger Hoffman and D.W. Rasch for Exxon Corp.; Toni D. Hennike and Gerald M. Bendo for Hunt Oil Co.; John J. Akins for Kerr-McGee Corp.; Robert C. Murray for Marathon Oil Co.; Paul F. O'Konski and Randolph C. Bruton for Mitchell Energy Corp.; Jay G. Martin for Mobil Natural Gas Inc. and Mobil Oil Exploration & Producing Southeast Inc.; Michael L. Pate for OXY USA Inc.; John B. Chapman, Sylvia McCormack, and John K. McDonald for Pennzoil Company; Larry Pain and Luke A. Mickum for Phillips Petroleum Co. and Phillips 66 Natural Gas Co.; Ronald D. Hurst for Placid Oil Co.; John Wolfe for Rosewood Resources, Inc.; Ralph J. Pearson, Jr. for Texaco Inc.; Kenneth L. Riedman, Jr. for Union Oil Co. of California; Kerry R. Brittain for Union Pacific Resources Co.; and Timothy J. Jacquet for Union Texas Petroleum Corp.
 William W. Brackett, with whom the following were on the joint brief for pipeline petitioners in 87-1588, et al.: Daniel F. Collins for ANR Pipeline Co. and Colorado Interstate Gas Co.; William G. von Glahn, Lewis A. Posekany, J. Diana Hall, and Michael E. Small for Williams Natural Gas Co.; Michael R. Waller and Jacob M. Hiatt for United Gas Pipeline Co.; Deborah A. MacDonald, Rockford G. Meyer, and William J. Grealis for Transwestern Pipeline Co.
 Timothy N. Black, with whom the following were on the joint brief for certain petitioners and intervenors in opposition to continued use of disallowed deficiency-based allocation mechanism for take-or-pay passthrough in 87-1588, et al.: John H. Pickering, Stephen J. Small, and Mark D. Clark for Columbia Gas Transmission Corp.; Lynne H. Church, Robert Fleishman, and Jeffrey D. Watkiss for Baltimore Gas and Elec. Co.; Roger C. Post and Jack L. Shailer for Columbia Gas Distribution Companies; Stephen E. Williams, Kevin J. Lipson, John E. Holtzinger, and Charles C. Thebaud, Jr. for CNG Transmission Corp.; Paul S. Buckley for Maryland People's Counsel; Jeffrey M. Petrash for Michigan Consolidated Gas Co.; Margaret Ann Samuels for Office of the Consumers' Counsel, State of Ohio; Lindsey How-Downing, Merek E. Lipson, and Patrick G. Golden for Pacific Gas and Elec. Co.; and Christopher J. Barr for UGI Corp.
 Charles F. Wheatley, Jr. and Philip B. Malter were on the brief for petitioner National Ass'n of Gas Consumers.
 Arnold D. Berkeley was on the brief for petitioners City of Willcox, Ariz. and Arizona Elec. Power Cooperative, Inc.
 Jeffrey M. Petrash for Michigan Consolidated Gas Co.; Frederick Moring, Jennifer N. Waters, and Toni M. Fine for Associated Gas Distributors; Robert Fleishman for Baltimore Gas and Elec. Co.; Margaret Ann Samuels for Office of Consumers' Counsel, State of Ohio; Kenneth J. Neises for Laclede Gas Co.; John M. Glynn for Maryland People's Counsel; Glenn W. Letham and Kenneth M. Albert for Memphis Light, Gas and Water Div., City of Memphis, Tenn.; Frank J. Kelley, Louis J. Caruso, Don L. Keskey, Henry J. Boynton, Patricia S. Barone, Ronald D. Eastman, Lynda S. Mounts, and Joel Kaufman for the State of Mich. and Michigan Public Service Com'n; and David L. Bloom for Northern Illinois Gas Co. also were on the joint brief for petitioners concerning contract demand reduction in 87-1588, et al.
 Richard C. Green, Donald J. MacIver, Jr., Richard Owen Baish, Scott D. Fobes, and T. Rush Moody, Jr. entered appearances for petitioner El Paso Natural Gas Co. in 87-1588, et al.
 Jerome M. Feit, Solicitor, F.E.R.C., with whom William S. Scherman, Gen. Counsel, Dwight C. Alpern and Jill Hall, Attys., F.E.R.C., were on the brief, for respondent in 87-1588, et al. John Estes and Joseph Davies, Attys., F.E.R.C., also entered appearances for respondent.
 
 
 1
 Edward J. Grenier, Jr., with whom the following were on the joint brief of intervenor industrial end user groups, state commissions, and consumer advocates in 87-1588, et al.: William H. Penniman, Glen S. Howard, and Sterling H. Smith for Process Gas Consumers Group, et al.; Paul S. Buckley for Maryland People's Counsel; Ronald D. Eastman, Lynda S. Mounts, and Joel Kaufman for State of Mich. and Michigan Public Service Com'n; Margaret Ann Samuels for Office of the Consumers' Counsel, State of Ohio; Janice E. Kerr, Michael B. Day, Edward W. O'Neill, and Harvey Y. Morris for Public Utilities Com'n of the State of Cal.; Richard A. Solomon and David D'Alessandro for Public Service Com'n, State of N.Y.; Robert F. Shapiro, Thomas E. Hirsch, III, and Gregory D. Chafee for American Paper Institute, Inc.; Lawrence F. Barth and Veronica A. Smith for Pennsylvania Public Utilities Com'n.
 
 
 2
 John H. Cheatham, III for Interstate Natural Gas Ass'n of America, Inc.; Raymond N. Shibley, Frank R. Lindh, and John A. Siegar for Panhandle Eastern Pipe Line Co. and Trunkline Gas Co.; Paul E. Goldstein and Paul W. Mallory for Natural Gas Pipeline Co. of America; Robert H. Benna and Terrence J. Collins for Tennessee Gas Pipeline Co.; Michael R. Waller for United Gas Pipe Line Co.; Daniel F. Collins and William W. Brackett for ANR Pipeline Co. and Colorado Interstate Pipeline Co.; William B. Grealis and Deborah A. MacDonald for Transwestern Pipeline Co.; and Stephen L. Huntoon for Williston Basin Interstate Pipeline Co. were also on the joint brief for pipeline intervenors in 87-1588, et al.
 
 
 3
 Frederick Moring, Jennifer N. Waters, and Toni M. Fine for Associated Gas Distributors; William T. Miller and Susan N. Kelly for American Public Gas Ass'n; Richard A. Solomon and David D'Alessandro for Public Service Com'n, State of N.Y.; Robert Fleishman for Baltimore Gas and Elec. Co.; John W. Glendening, Jr. and Barbara K. Keffernan for the Berkshire Gas Co., et al.; Robert B. Langstaff for Board of Water Gas and Light Commissioners, Albany, Ga.; William I. Harkaway, Harvey L. Reiter, Barbara M. Gunther, and Martin J. Bregman for Consolidated Edison Co. of New York, Kansas Power and Light Co., Kansas Public Service, Missouri Public Service, and Peoples Natural Gas Co.; Jennifer N. Waters, Toni M. Fine, and Kenneth J. Neises for Laclede Gas Co.; James F. Bowe, Jr. and O. Julia Weller for Long Island Lighting Co.; Glenn W. Letham and Kenneth M. Albert for Memphis Light Gas and Water Div., City of Memphis, Tenn.; Jeffrey M. Petrash and Daniel L. Schiffer for Michigan Consol. Gas Co.; Frank J. Kelley, Louis J. Caruso, Don L. Keskey, Henry J. Boynton, Patricia S. Barone, Ronald D. Eastman, Lynda S. Mounts, and Joel Kaufman for State of Mich. and Michigan Public Service Com'n; Charles F. Wheatley, Jr. for National Ass'n of Gas Consumers; Harry H. Voigt and M. Reamy Ancarrow for Niagara Mohawk Power Corp.; David I. Bloom for Northern Illinois Gas Co.; William A. Spratley and Margaret Ann Samuels for Office of the Consumers' Counsel, State of Ohio; Thomas M. Patrick, Mark J. McGuire, and Karen Lee for Peoples Gas Light & Coke Co. and North Shore Gas Co.; Lawrence F. Barth and Veronica A. Smith for the Pennsylvania Public Utility Com'n; William R. Hoatson and James R. Lacey for Public Service Elec. & Gas Co.; Janice E. Kerr and Harvey Y. Morris for the Public Utilities Com'n of the State of Cal.; Frank H. Stricklker, Gordon M. Grant, and Ralph E. Fisher for Washington Gas Light Co. were also on the joint brief for intervenors local distribution companies, state commissions, and related agencies in 87-1588, et al.
 
 
 4
 Charles J. McClees, Jr., James A. Ruoff, and Thomas G. Johnson for Shell Offshore Inc. and Shell Western E & P Inc.; Jack M. Wilhelm for Amoco Production Co.; R. Gordon Gooch and F. Nan Wagoner for Anadarko Petroleum Co.; Richard G. Morgan for Apache Corp.; Harris S. Wood and Kathleen E. Magruder for Arco Oil and Gas Co.; David J. Evans for Chevron U.S.A. Inc.; Ernest J. Altgelt, III for Conoco, Inc.; C. Roger Hoffman and D.W. Rasch for Exxon Corp.; Toni D. Hennike and Gerald M. Bendo for Hunt Oil Co.; John J. Akins for Kerr-McGee Corp.; Robert C. Murray for Marathon Oil Co.; R. Brent Harshman for Maxus Energy Corp.; Randolph C. Bruton for Mitchell Energy Corp.; Jay G. Martin for Mobil Natural Gas Inc. and Mobil Oil Exploration & Producing Southeast Inc.; Michael L. Pate for OXY USA Inc.; John B. Chapman, Sylvia McCormack, and John K. McDonald for Pennzoil Co.; Larry Pain and Luke A. Mickum for Phillips Petroleum Co. and Phillips 66 Natural Gas Co.; Ronald D. Hurst for Placid Oil Co.; John Wolfe for Rosewood Resources, Inc.; Ralph J. Pearson, Jr. for Texaco Inc.; Kenneth L. Riedman, Jr. for Union Oil Co. of California; Kerry R. Brittain for Union Pacific Resources Co.; and Timothy J. Jacquet for Union Texas Petroleum Corp. also were on the joint brief for intervenors producers and the State of Louisiana in 87-1588, et al.
 
 
 5
 Charles F. Wheatley, Jr. and Philip B. Malter also were on the brief for intervenor National Ass'n of Gas Consumers.
 
 
 6
 David I. Bloom and Evan M. Tager for Northern Illinois Gas Co.; Frederick Moring, Jennifer N. Waters, and Toni M. Fine for Associated Gas Distributors; Harry H. Voigt and M. Reamy Ancarrow for Niagara Mohawk Power Corporation; Edward B. Myers for Orange and Rockland Utilities, Inc.; Thomas M. Patrick for Peoples Gas Light and Coke Co. and North Shore Gas Co.; Lindsey How-Downing for Pacific Gas and Elec. Co.; E.R. Island and David L. Huard for Southern California Gas Co.; Jennifer N. Waters and Toni M. Fine for United Cities Gas Co. also were on the joint brief for intervenors Northern Illinois Gas Co., et al. in 87-1588, et al.
 
 
 7
 Robert C. Platt and Mark K. Seifert entered appearances for intervenor Independent Petroleum Ass'n of America.
 
 
 8
 Ivy Lincoln entered an appearance for intervenor Arkansas Public Service Com'n.
 
 
 9
 Richard C. Green also entered an appearance for intervenor El Paso Natural Gas Co.
 
 
 10
 Christopher K. Sandberg and Dennis D. Ahlers entered appearances for intervenor Energy Issues Intervention Office of the Minnesota Dept. of Public Service.
 
 
 11
 Norma K. Scogin and Sarah F. Miller entered appearances for intervenor Railroad Com'n of Texas.
 
 
 12
 Ralph E. Simon, Jr. entered an appearance for intervenor Transok, Inc.
 
 
 13
 Luis M. Guzman entered an appearance for intervenor Valero Transmission, L.P.
 
 
 14
 M. Frazier King, Jr. entered an appearance for intervenor Valero Interstate Transmission Co.
 
 
 15
 R. David Henrickson and Donna J. Bailey entered appearances for intervenor Southern Natural Gas Co.
 
 
 16
 Stephen A. Herman entered an appearance for intervenor Fertilizer Institute.
 
 
 17
 Patricia A. Curran entered an appearance for intervenor Cabot Corp.
 
 
 18
 Jerry M. Amos entered an appearance for intervenor Piedmont Natural Gas Co.
 
 
 19
 Charles H. Shoneman entered an appearance for intervenor Independent Oil & Gas Ass'n of West Virginia.
 
 
 20
 John W. Glendening, Jr. and Bruce B. Glendening entered appearances for intervenor Bay State Gas Co., et al.
 
 
 21
 Phyllis G. Rainey entered an appearance for intervenor Tenneco Oil Co.
 
 
 22
 Michael J. Manning, James F. Moriarty, and James P. White entered appearances for intervenor Tennessee Small General Service Customer Group.
 
 
 23
 James T. Bailey, Platt W. Davis, III, and David T. Andril entered appearances for intervenor Arkla Energy Resources.
 
 
 24
 Charles M. Darling, Stephen L. Teichler, and Sheryl S. Hendrickson entered appearances for intervenor Ashland Exploration, Inc.
 
 
 25
 C. Burnett Dunn and William I. Harkaway entered appearances for intervenor ONG Transmission Co., et al.
 
 
 26
 David P. Yaffe entered an appearance for intervenor Citizens Energy Corp., et al.
 
 
 27
 George L. Weber entered an appearance for intervenor National Fuel Gas Supply Corp.
 
 
 28
 John E. Holtzinger, Jr. and Jacolyn A. Simmons, Washington, D.C., entered appearances for intervenor Atlanta Gas Light Co.
 
 
 29
 F. Nan Wasgoner, Gordon Gooch, and Katherine B. Edwards, Washington, D.C., also entered appearances for intervenor Union Texas Petroleum Corp.
 
 
 30
 Before: WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.
 
 
 31
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 32
 Table of Contents
I. Introduction ....................................................... 1503
II. Inaction under Section 5 ........................................... 1504
 A. Scope of Review ................................................ 1504
 B. The Merits ..................................................... 1505
 1. Absence of power over nonjurisdictional
 contracts ............................ 1505
 2. Mismatch ............................... 1507
 3. Comparative advantages of individual
 settlement negotiations .............. 1508
III. Crediting Mechanism ................................................ 1509
 A. Producer Claims that Crediting is No Longer Needed and Pipeline
 Claims to a Broader Weapon Against Producers ................. 1509
 B. Panhandle/Northern Natural ..................................... 1510
 C. Outer Continental Shelf Lands Act .............................. 1511
 D. Casinghead Gas ................................................. 1512
 E. "Double Crediting" ............................................. 1513
IV. Pregranted Abandonment ..................................... 1513
 A. Jurisdiction ......................................... 1514
 B. The Merits ........................................... 1515
 1. Decision illegally delegated to pipeline ....... 1515
 2. Reasoned decisionmaking ........................ 1516
 C. Conclusion ........................................... 1518
V. Miscellaneous Claims ....................................... 1518
 A. Contract Demand Reduction ............................ 1518
 B. Take-or-pay Cost Passthrough ......................... 1519
 1. Sunset date .................................... 1519
 2. Opportunity to recover prudently incurred costs 1519
 3. Continued use of passthrough mechanism ......... 1519
 C. Passthrough at the State Level ....................... 1520
VI. Conclusion ................................................. 1520
----------
 I. Introduction
 
 
 33
 In the Spring of 1985, as Mikhail Gorbachev was assuming the duties of General Secretary and inaugurating perestroika, the Federal Energy Regulatory Commission launched its own restructuring of the natural gas industry. See Notice of Proposed Rulemaking, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 24,130 (June 7, 1985) (issued May 30, 1985). The cornerstone was "open access"--a process by which a pipeline would be able to avoid many of the regulatory hurdles otherwise impeding the provision of gas transportation, in exchange for committing itself to carry gas for any party, including gas that would be sold in competition with its own. Open access would thus provide a market-based incentive to pipelines to keep the costs of their own gas competitive.
 
 
 34
 As with Gorbachev, the road has not been smooth. The Commission issued its final rule, Order No. 436, in October 1985. In Associated Gas Distributors v. FERC ("AGD I "), 824 F.2d 981 (D.C.Cir.1987), we generally approved the rule but vacated it on the ground that the Commission had failed to adequately address some fundamental problems, especially the rule's effect on pipelines' take-or-pay liabilities. The Commission moved swiftly to promulgate a substitute rule (Order No. 500, 52 Fed.Reg. 35,334 (Aug. 14, 1987)) before our mandate issued, so that open access transportation could continue without interruption.
 
 
 35
 Innumerable parties attacked not only Order No. 500 (and later orders of the 500 series), but also many individual FERC adjudications of issues based on Order No. 500. Many of these were consolidated and argued before us in the Fall of 1989. In American Gas Ass'n v. FERC ("AGA I "), 888 F.2d 136 (D.C.Cir.1989), the court resolved several of the claims but remanded the record to the Commission to address some issues that AGD I had said it must consider, as well as some new problems posed by Order No. 500 itself. (We disposed of still other components of the case in Associated Gas Distributors v. FERC ("AGD II "), 893 F.2d 349 (D.C.Cir.1989), petitions for certiorari filed, 59 U.S.L.W. 3017 (Nos. 89-1988, -1989, -1990, -2000, -2016), and Transwestern Pipeline Co. v. FERC, 897 F.2d 570 (D.C.Cir.1990)). As a result of the remand, the Commission issued Order No. 500-H, III FERC Stats. & Regs. p 30,867 (1989), and, on applications for rehearing, Order No. 500-I, III FERC Stats. & Regs. p 30,880 (1990). The contending parties were of course not satisfied, and here we review their contentions.
 
 
 36
 First, we affirm the Commission's rejection of demands that it should have intervened under Sec. 5 of the Natural Gas Act, 15 U.S.C. Sec. 717d (1988), to modify uneconomic take-or-pay contracts between producers and pipelines. Second, we affirm in virtually all respects its decisions creating a "crediting" mechanism. This allows pipelines that carry gas under open access (which is likely to displace their own and thus aggravate their take-or-pay liabilities) to obtain credit in an equal amount against their take-or-pay obligations under contracts with the gas's producer. As to one feature, however, we remand the case to the Commission for further consideration. Third, although we cannot find any insuperable legal obstacle to the Commission's provision for "pregranted abandonment" of transportation services provided under "blanket certificates," we remand the case on that issue because the Commission's explanations do not adequately justify its decision or respond to opponents' claims. Finally, we reject a series of miscellaneous contentions as either unripe or lacking in merit.
 
 II. Inaction under Section 5
 
 37
 In AGD I, this court vacated Order No. 436 and remanded for the Commission to reassess both its reasoning and its factual premises for refusing to modify "uneconomical pipeline-producer contracts" under Sec. 5 of the Natural Gas Act. 824 F.2d at 1030. The Commission then collected extensive data from the pipelines, including figures on the relation between high prices and take-or-pay provisions, and on the proportion of contracts that were within or without its jurisdiction. On issuing its requests to the pipelines for data, it promised to aggregate and analyze the results promptly. Order No. 500, 52 Fed.Reg. at 30,341.
 
 
 38
 Despite that promise, the Commission did virtually nothing after collecting the data, and its "half-explained cunctation [convinced the AGA I court] that it delay[ed] in order to avoid having to do the analysis that we required in AGD until after the take-or-pay problem ... disappeared." AGA I, 888 F.2d at 148. Accordingly we remanded for FERC to explain in a final rule whether it planned to take Sec. 5 action, and if not, why not. Id. The Commission has now done so in Order Nos. 500-H and 500-I, and we find its explanation sufficient.
 
 
 39
 A. Scope of Review.
 
 
 40
 Certain petitioners attempt to cast the Commission's duty to act under Sec. 5 in mandatory terms. Drawing on the language of Sec. 5 saying that the Commission "shall determine the just and reasonable rate ... to be thereafter observed and in force," 15 U.S.C. Sec. 717d (1988) (emphasis added), they argue that the Commission must undertake a Sec. 5 investigation whenever requested to do so. But the directive to impose a just and reasonable rate or provision is triggered only by the Commission's finding that the existing one is "unjust, unreasonable, unduly discriminatory, or preferential." Nothing in Sec. 5 requires the Commission to embark on the inquiry in the first place.[1]
 
 
 41
 Nor did our decision in AGD I impose any such burden. We simply concluded that the Commission had not considered all the factors relevant to pursuit of such an inquiry. Most particularly, the Commission appeared virtually to deny the tendency of its restructuring program--open access transportation and a grant to customers of authority to convert purchase arrangements into transportation--to aggravate the pipelines' take-or-pay liabilities and thus, arguably, to generate a need for action under Sec. 5. AGD I, 824 F.2d at 1021-28, 1044; see also San Diego Gas & Elec. Co. v. FERC, 904 F.2d 727, 730-31 (D.C.Cir.1990) (summarizing material passages of AGD I ). Thus our remand insisted that the Commission reassess whether Sec. 5 should play a role in the solution.
 
 
 42
 Our review of the Commission's decision not to take action is therefore quite limited in scope. The Commission correctly invokes General Motors Corp. v. FERC, 613 F.2d 939 (D.C.Cir.1979), stating that we review a no-investigation decision under Sec. 5 only to ensure that the Commission has "consider[ed] all the relevant factors." Id. at 944; see also Southern Union Gas Co. v. FERC, 840 F.2d 964, 968-70 (D.C.Cir.1988). As neither the Commission nor any petitioners have invoked Heckler v. Chaney, 470 U.S. 821, 831-35, 105 S.Ct. 1649, 1655-57, 84 L.Ed.2d 714 (1985), holding that nonenforcement decisions are ordinarily unreviewable by virtue of Sec. 10(a)(2) of the Administrative Procedure Act, we need not consider whether it argues for nonreviewability or for greater deference.
 
 
 43
 B. The Merits.
 
 
 44
 The core of the Commission's analysis was as follows: First, its authority to modify take-or-pay provisions under Sec. 5 reaches only wellhead contracts subject to its jurisdiction. Second, even as to contracts accessible under Sec. 5, permissible modifications would not suitably match the problems. Third, private negotiation within the industry, under Commission-created incentives, had good prospects of working and indeed seemed to be doing so. We address these in turn, concentrating on the want of authority over nonjurisdictional contracts, the only purely legal issue.
 
 
 45
 1. Absence of power over nonjurisdictional contracts. A major premise of the Commission's decision was its conclusion that its Sec. 5 power could not reach even the non-price terms of nonjurisdictional contracts. In Order Nos. 500-H and 500-I it found that these accounted for 53% of the roughly $9 billion of unresolved take-or-pay liability at year-end 1986. III FERC Stats. & Regs. at 31,542, 31,715 n. 88. (The proportion of wellhead sales that is subject to FERC jurisdiction steadily declines, as Congress in the Natural Gas Policy Act eliminated such jurisdiction over what may loosely be characterized as "new" gas, which gradually increases as a share of the total as old gas is exhausted. See NGPA Sec. 601(a)(1)(A) & (B), 15 U.S.C. Sec. 3431(a)(1)(A) & (B); Pennzoil Co. v. FERC, 645 F.2d 360, 380 (5th Cir.1981).) Accordingly, the Commission reasoned that use of Sec. 5 would provide a less finely tuned solution than other means--private negotiation under the incentives created by its crediting mechanism--to offset the effects of its restructuring program and to correct the industry's disequilibrium.
 
 
 46
 In reviewing the Commission's resolution of the jurisdictional issue, we need not decide whether Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), mandates deference to an agency interpretation of its own jurisdiction. See The Business Roundtable v. SEC, 905 F.2d 406, 408-09 (D.C.Cir.1990) (reviewing authorities). As we read the Natural Gas Act, the Commission was absolutely right: Congress clearly limited its Sec. 5 powers to jurisdictional contracts.
 
 
 47
 Section 5(a) of the Natural Gas Act provides:
 
 
 48
 Whenever the Commission, after hearing had upon its own motion or upon complaint of any State [etc.], shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order....
 
 
 49
 15 U.S.C. Sec. 717d (1988).
 
 
 50
 The pipeline petitioners isolate the words "contract affecting such rate," and argue that the Commission may assess the justness and reasonableness of the provisions of any contract that would likely influence a pipeline's end-of-the-pipeline charges, and, if it finds any such provision unjust or unreasonable, replace it with one that meets that standard. Even they, of course, concede that any such power could not reach the prices set forth in nonjurisdictional contracts, as Sec. 601(b)(1)(A) of the Natural Gas Policy Act, 15 U.S.C. Sec. 3431(b)(1)(A), generally determines that the prices of even jurisdictional wellhead sales are automatically just and reasonable if they are either within their NGPA ceilings or are exempt from such ceilings.
 
 
 51
 The Commission reads "contract affecting such rate" as limited to contracts in which a "natural gas company" (within the meaning of the NGA) acts as seller and which directly governs the rate in a jurisdictional sale--providing for the rate in whole or in part, or specifying or embodying it, or setting forth rules by which it is to be calculated. III FERC Stats. & Regs. at 31,539. Contracts that "affect" a rate indirectly, merely by affecting the costs that determine what pipeline sales rates are permissible under the NGA's "just and reasonable" standard, are beyond Sec. 5's reach.
 
 
 52
 We think petitioners' view would make a nonsense of the Supreme Court's decision in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), and (more significantly) of Congress's effort 24 years later to undo Phillips with the Natural Gas Policy Act. The Natural Gas Act's basic grant of jurisdiction appears in Sec. 1(b), and extends to interstate transportation of gas, to interstate sales for resale, and to natural gas companies engaging in either. 15 U.S.C. Sec. 717(b). In Phillips, the Supreme Court construed the authority over interstate sales for resale to encompass producers' wellhead sales for resale, against a contention that Sec. 1(b)'s exclusion of "production or gathering" foreclosed such a view. The Court explicitly saw as the consequence of its decision the fulfillment of a congressional intent "to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce." Id. at 682, 74 S.Ct. at 799. On petitioners' view, Phillips 's narrow construction of the "production or gathering" exemption was completely unnecessary for fulfillment of that intent; under Sec. 5 the Commission would have had the authority to control wellhead rates merely because those rates are elements in the computation of pipelines' sales rates. Indeed, petitioners' theory is, more generally, an oxymoron--Commission jurisdiction over nonjurisdictional contracts.
 
 
 53
 Twenty-four years after Phillips, Congress in the NGPA took away FERC's jurisdiction over wellhead sales of what may loosely be called "new" gas, see NGPA Sec. 601(a)(1)(A) & (B), 15 U.S.C. Sec. 3431(a)(1)(A) & (B). In more sweeping terms, it reduced FERC's jurisdiction over wellhead prices. The prices of wellhead sales that remained jurisdictional were deemed to satisfy the NGA's requirement that jurisdictional prices be "just and reasonable" so long as they complied with the NGPA's ceilings. See NGPA Sec. 601(b)(1)(A), 15 U.S.C. Sec. 3431(b)(1)(A). Finally, as to downstream prices, the NGPA guaranteed interstate pipelines' recovery of amounts paid for gas if the price was deemed "just and reasonable" under Sec. 601(b), i.e., was in compliance with the NGPA. See Sec. 601(c), 15 U.S.C. Sec. 3431(c). The interaction of the Commission's residual "non-price" jurisdiction over transactions whose prices are beyond its jurisdiction itself raises a delicate issue: what kinds of Sec. 5 control over non-price terms might the Commission exert without commandeering the price authority that Congress expressly denied? We need not answer that question, as the Commission has declined to exercise its Sec. 5 power at all. But it would greatly extend the scope of the dilemma if the Commission were empowered to reach the non-price terms of nonjurisdictional contracts.
 
 
 54
 The Supreme Court has not defined the class of contracts reached by Sec. 5, but has spoken to the scope of the parallel section of the Federal Power Act, Sec. 206, 16 U.S.C. Sec. 824e (1988). In FPC v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), it found that the Commission (actually, FERC's predecessor, the Federal Power Commission) had a duty to consider whether the structure of a utility's jurisdictional (wholesale) and nonjurisdictional (retail) rates might impose a "price squeeze" on the firms that bought from it at wholesale and sold in competition with it at retail. In identifying a price squeeze, of course the Commission would have to compare nonjurisdictional with jurisdictional rates, but the Court was quite clear that "[t]he remedy, if any, would operate only against the rate for jurisdictional sales." Id. at 279, 96 S.Ct. at 2005 (emphasis added); see also id. at 276, 96 S.Ct. at 2003 ("the Commission's power to set just and reasonable rates under Sec. 206(a) [is] accordingly limited to sales 'subject to the jurisdiction of the Commission' ").[2] Of course Conway denies the Commission power only over a utility's nonjurisdictional sales contracts, and so is not direct authority for want of such power over nonjurisdictional purchase contracts. But it surely suggests that the potential impact of nonjurisdictional contracts' prices on the justness and reasonableness of jurisdictional rates provides no license for the Commission to monkey with the former.
 
 
 55
 Pennzoil Co. v. FERC, 645 F.2d 360, 381 (5th Cir.1981), also argues against petitioners' position (but also inconclusively). The court held that the Commission's authority to interpret (and nullify) price escalation clauses in contracts as to which the price increase could take effect only by a filing under Sec. 4 of the NGA (i.e., jurisdictional contracts), did not give it any such interpretive or nullification authority over price escalation clauses in nonjurisdictional contracts. As the petitioners justly observe, Pennzoil involves Sec. 4, not Sec. 5. But they fail to advance any logic supporting a far greater reach for the Commission under Sec. 5.
 
 
 56
 Petitioners claim that somewhere in the chain of decisions captioned Office of Consumers' Counsel, Ohio v. FERC, 783 F.2d 206 (D.C.Cir.1986), 826 F.2d 1136 (D.C.Cir.1987), 842 F.2d 1308 (D.C.Cir.1988), we held that Sec. 5 affords authority to modify non-price terms of nonjurisdictional contracts. The third decision reviews the entire series and makes clear that the facts did not pose the issue and that the court never purported to address it. See OCC III, 842 F.2d at 1309-10.
 
 
 57
 Weighing against petitioners' theory is that logically it reaches pipelines' contracts for every other possible factor of production--even legal services. Petitioners themselves offer no distinction between these and gas contracts except as to the degree of impact on the pipelines' selling prices. That line, in contrast to the Commission's, has no conceptual core and thus seems awkward and implausible as a jurisdictional boundary.
 
 
 58
 Accordingly, we find the Commission entirely correct in its premise that it lacks authority to modify even the non-price terms of nonjurisdictional contracts.
 
 
 59
 2. Mismatch. As the Commission explained, the so-called take-or-pay problem arises in reality from "the combination of high take and high price provisions." III FERC Stats. & Regs. at 31,543; see also id. at 31,545 (contracts "a problem only because [the] expectation [of continued high demand for gas at relatively high prices], reasonable at the time, proved incorrect"). Indeed, take-or-pay provisions are primarily contract authorizations of a kind of specific performance for the seller. The centrality of price is underscored by the fact that most specific Sec. 5 proposals called for the Commission to modify the contracts by inserting "market-out" clauses, allowing the pipeline to escape if the producer refused to lower the price. III FERC Stats. & Regs. at 31,543-45; see, e.g., Responses of AGD to Questions Posed by Commissioners Concerning Order No. 500 at 18, R. 10803 (reproduced in Appendix of Local Distribution Companies, State Commissions and Related Agencies ("LDC App.") at 107) (insert market-out clause for any contract containing a take-or-pay clause above 50% and a price above pipeline's weighted average cost of gas); Supplemental Comments of Allied Commenters at 24 (LDC App. at 137) (same); Comments of the Illinois Commerce Commission in Response to Order 500 Interim Rule and Statement of Policy at 15, R. 3226 (LDC App. at 20) (delete the take-or-pay requirements). Adoption of any such proposals would appear to undercut Congress's deciMsion that NGPA-complying prices are to be deemed just and reasonable.
 
 
 60
 Any across-the-board reduction of take percentages (the percentage of deliverable gas that a pipeline must take or pay for) would be both under- and overinclusive. About 25% percent of remaining high take-or-pay contracts are for low-priced gas. See III FERC Stats. & Regs. at 31,545. An across-the-board reduction in take percentages would reach these, impairing producers' contract rights with little benefit for pipelines. At the same time, such a reduction would leave the pipelines subject to contract duties to buy large amounts of high-priced gas and thus partially disabled from successfully competing with lower-priced spot-market gas. Id. at 31,543-44.
 
 
 61
 The Commission affirmed, moreover, that take-or-pay provisions have a legitimate role in producer-pipeline contracts. (Not to do so would seem to condemn longterm gas purchase contracts to extinction. They would be virtually meaningless with no remedy, and it is not clear that take-or-pay is much more draconian than ordinary contract damages, as the forced purchaser can take and resell at a loss.) The Commission saw the clauses as assuring the producer some minimum level of revenue to cover operating expenses and debt. Id. at 31,544. Further, it noted that the suitable level varies with the circumstances. Individual operators' financial circumstances vary, as does the minimum rate of extraction from a reservoir necessary to secure the optimal level of total recovery. Id. at 31,545. (Indeed, one can readily imagine other potentially relevant variations, such as the contracting parties' risk aversion and their means of influencing each other's behavior.) Thus the Commission could make no generic finding of a reasonable take-or-pay percentage, and case-by-case analysis of thousands of contracts would be, it observed conservatively, "administratively difficult." Id. The Commission is entitled, of course, to give great weight to issues of internal resource allocation in making a no-go decision under Sec. 5. See National Fuel Gas Supply Corp. v. FERC, 900 F.2d 340, 345 (D.C.Cir.1990), and cases cited therein.
 
 
 62
 3. Comparative advantages of individual settlement negotiations. The Commission found that individual settlement negotiations, under incentives structured by its crediting mechanism, provided an avenue for resolution of the take-or-pay difficulties that was free of the incongruities of action under Sec. 5. Such settlements would take into account specific factors relevant to the contracting parties, see III FERC Stats. & Regs. at 31,546, and would accord with Congress's strong preference for reliance on private agreements for structuring the wellhead market, see id. at 31,546-47. See also Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101-60, 103 Stat. 157 (1989) (generally removing all wellhead price limits and all Commission jurisdiction over wellhead sales by 1993).
 
 
 63
 Although the Commission was actually making this decision in 1989-90, petitioners argue (and we will assume) that its duty was to consider matters as they stood at the time it adopted open access in 1985. See OCC II, 826 F.2d 1136 (D.C.Cir.1987) (where legal error has caused a delay in Commission action under Sec. 5, it should afford a remedy that corrects for the delay). On this view, the policy question was whether adding Sec. 5 action to the picture at that time would have been wise. We read the Commission analysis as fundamentally addressing that question. Nevertheless, it reported figures as to the actual resolution of conflicts in the meantime, presumably to show that ex post data confirmed its ex ante analysis. For example, it found that by March 1989 negotiations had resolved all but about $2.4 billion of $9 billion in liabilities outstanding at year-end 1986, III FERC Stats. & Regs. at 31,542-43, and that on average pipelines paid only 18.6 cents on the dollar for these settlements, id. at 31,522. The local distribution company ("LDC") petitioners attack this figure as inaccurate, or at least unverifiable.[3] They argue that the true cost of the take-or-pay buyouts and buydowns for pipelines has been much higher.
 
 
 64
 It is true that the precision suggested by the figure 18.6 cents is illusory. As the LDCs point out, most of the ingredients of the conclusion are squishy soft. For example, in comparing the amounts paid out with relief obtained, the Commission included in the latter not only take-or-pay liabilities extinguished but also $27 billion in "future-oriented relief." Id. at 31,522. How the latter was calculated is not revealed, and in the nature of things could not be firm: how could the Commission accurately estimate how a pipeline's sales would match its contract obligations over years into the future? Moreover, it is not altogether clear to what extent the liabilities extinguished were gross or net--i.e., offset by the value of the gas paid for (to the extent that pipelines by contract still could take the gas). But the Commission has not used the 18.6 cent figure as a precise measure of the allocation of the burden between producers and pipelines--a measure that, besides being unverifiable, would be largely meaningless as there is no "right" allocation. Rather, we read the Commission as gleaning from the data a general confirmation of the proposition that the crediting mechanism and other factors would force the producers to assume a significant share of the sunk costs arising from actions taken long ago in the expectation of continued high prices. The LDCs' and pipelines' arguments do not seriously draw that proposition in question.
 
 
 65
 All in all, we find that the Commission's approach handily meets the standard of General Motors, Southern Union and AGD I. We have no basis whatever for forcing the Commission into interference with thousands of contracts, in the form either of generic rules or interminable case-by-case decisions, which in either event would be only dimly related to the price difficulty that is the core of the pipelines' problem and is plainly off the Commission's reservation.
 
 III. Crediting Mechanism
 
 66
 Under the crediting mechanism, a pipeline accepting a blanket certificate may deny a producer the benefits of open access unless the producer allows the pipeline to credit each unit of transported gas (subject to some exceptions) against outstanding take-or-pay contracts. The pipeline may apply the credit to any contract between the producer and the pipeline which was entered into before June 23, 1987 (the date of our decision in AGD I ); because of this power to select among contracts, the producers dub the process "cross-crediting." The mechanism continues in effect until the earlier of December 31, 1990 (or, if our mandate in this case has not issued by then, 60 days after our mandate issues), or the date on which a pipeline accepts a "gas inventory charge" certificate, III FERC Stats. & Regs. at 31,528-29, under which a pipeline can charge its customers for the cost of standing ready to supply gas. See Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 573 (D.C.Cir.1990).
 
 
 67
 A. Producer Claims that Crediting Is No Longer Needed and Pipeline Claims to a Broader Weapon Against Producers.
 
 
 68
 The producers argue that the take-or-pay problem has largely gone away, renMdering the crediting mechanism obsolete. The pipelines make an argument in the opposite direction--that they should be allowed to deny any access to a producer who has refused "to modernize its contracts." Joint Brief for Pipeline Petitioners on Mandate Compliance at 26. (We take "modernize" to be a euphemism for accommodating pipeline wishes.) Neither argument has legal merit.
 
 
 69
 The producers concede that the crediting mechanism (or the threat of its use) helped pressure them into settling much of their take-or-pay rights against the pipelines. The Commission, reasonably enough, concluded that in future negotiations over the remaining take-or-pay liability, the mechanism would serve the same purpose. III FERC Stats. & Regs. at 31,527-28, 31,700. To the extent that the producers argue that the mechanics of crediting (which we will spare the reader) have become more of a hassle than they are worth, we must defer to the Commission's judgment call the other way. Finally, the producers suggest that most of the remaining take-or-pay liability is in litigation, dispensing (they say) with any further need for a pipeline bargaining chip. As lawsuits can settle (and most do), the utility of bargaining chips survives their filing.
 
 
 70
 The pipelines rest their claim on language in AGD I expressing skepticism about the Commission's apparent assumption that "pipeline denial of access to producers that stand on the letter of their contract rights [would be] unduly discriminatory." 824 F.2d at 1028. The pipelines would transform this observation into a mandate that the Commission give the pipelines an absolute veto over recalcitrant producers. Obviously it was not--the passage went on to suggest types of conditions that the Commission might place on any such pipeline veto power. Id. at 1028-29. In adopting the crediting mechanism the Commission in effect gave the pipelines a conditional veto. The Commission has in this respect fulfilled the mandate of AGD I.
 
 
 71
 B. Panhandle/Northern Natural.
 
 
 72
 The producer petitioners attack the Commission's approval of the crediting mechanism as a violation of the principles of Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120 (D.C.Cir.1979), and Northern Natural Gas Co. v. FERC, 827 F.2d 779 (D.C.Cir.1987), which forbid it from using its power to impose conditions on certificates of service, under Sec. 7(e) of the Natural Gas Act, 15 U.S.C. Sec. 717f(e), to "adjust[ ] previously approved rates for services not before the Commission in the relevant certificate proceeding."[4] 827 F.2d at 786. In both those cases, the Commission had conditioned new service on the pipelines' "crediting" part of the resulting revenues to users of other service, i.e., reducing the rates charged for the other service. See 613 F.2d at 1130-31 n. 52; 827 F.2d at 786.
 
 
 73
 The producers can at most be appealing to the spirit of Panhandle and Northern Natural, for the Commission's action by no means fits the letter. Whereas in those cases the Commission conditioned its grant of the applying pipelines' certificates on their reducing rates for other service, here it has provided that pipelines applying for and receiving blanket certificates shall have the authority to deny open access to a specific class of would-be customers; in other words, it has refined the concept of nondiscrimination that is the essence of the service itself being certificated.
 
 
 74
 But in any event we do not propose to kill the spirit of Panhandle and Northern Natural. One might express that spirit as a proposition that the Commission may not use its Sec. 7 conditioning power to do indirectly (1) things that it can do only by satisfying specific safeguards not contained in Sec. 7(e) (in the case of reducing previously-approved jurisdictional rates, by meeting its burden under Sec. 5, see Panhandle, 613 F.2d at 1130; Northern Natural, 827 F.2d at 782), or (2), a fortiori, things that it cannot do at all. If the crediting mechanism reduced the rates charged in pipeline/producer contracts, the second variant would be applicable, for under Sec. 601(b)(1)(A) of the Natural Gas Policy Act, 15 U.S.C. Sec. 3431(b)(1)(A) (1988), wellhead prices are (generally) lawful under the Natural Gas Act if they are within the NGPA ceilings or subject to no such ceilings. If the mechanism modified non-price terms of the contracts, then as to jurisdictional contracts it would be an act that the Commission can perform only by meeting Sec. 5's requirements; as to nonjurisdictional ones, it would be, as we have just seen, an act the Commission cannot perform at all.
 
 
 75
 But the crediting mechanism neither reduces rates nor modifies non-price terms; it creates incentives for producers to agree to reductions and modifications. There is a difference, and the producers recognize it. They concede that the Commission's authorization of pipeline insistence on credits is within its jurisdiction as to credits against take-or-pay obligations in a contract to which the gas being transported is (or was) subject. See Joint Initial Brief of Indicated Producers at 19-20; see also III FERC Stats. & Regs. at 31,709. But provision for pipeline insistence on that more limited credit also alters the bargaining relationship of the parties; it establishes that any producer shipment of contract gas over the (formerly purchasing) pipeline ipso facto reduces the pipeline's take-or-pay obligation. Thus the producers recognize that the Panhandle/Northern Natural principle does not bar the Commission from establishing certificate conditions with an eye to inducing changes in transactions that are beyond its direct grasp.
 
 
 76
 The producers accordingly are reduced to arguing that transportation service has "no relation whatsoever" to gas sold by a producer to a pipeline under other contracts. Joint Initial Brief of Indicated Producers at 20. But the core purpose of open access was to extend the competitive character of the wellhead market all the way to the burner tip by unbundling the gas commodity from its transportation and assuring consumers access to the wellhead market. A major stumbling block to its implementation was the pipelines' reasonable fear that producers' and others' use of it would displace their own gas sales and balloon their take-or-pay liabilities. The Commission therefore adopted the crediting mechanism in order to give pipelines "the bargaining power necessary to negotiate reasonable settlements of their take-or-pay problems." See III FERC Stats. & Regs. at 31,549. The relation could hardly be tighter.
 
 
 77
 In essence, the producers want to have their cake and eat it. They want both the full benefit of very favorable contracts under the old regime, and the full right to force pipelines to carry their gas under the new. Instead the Commission put them to the choice. By defining limits to the producers' entitlement to open access, it enhanced the prospect of achieving its goals. We do not read this structuring of incentives as an invasion of territory beyond the Commission's jurisdiction.
 
 
 78
 C. Outer Continental Shelf Lands Act.
 
 
 79
 In Order No. 500, the Commission allowed pipelines to refuse to transport gas on the Outer Continental Shelf for producers who would not give credits for such gas. The producers argued in AGA I that the Commission lacked the power to so restrict open access on the OCS because Secs. 5(e) and 5(f) of the OCSLA, 43 U.S.C. Secs. 1334(e)-(f) (1982), already gave them an unqualified right of access to OCS pipelines. Specifically, Sec. 5(e) allows pipelines rights-of-way across the OCS
 
 
 80
 upon the express condition that [they] shall transport or purchase without discrimination, oil or natural gas produced from submerged lands or outer Continental Shelf lands.
 
 
 81
 43 U.S.C. Sec. 1334(e). And Sec. 5(f), added in 1978, provides that
 
 
 82
 every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the outer Continental Shelf of oil or gas shall require that the pipeline be operated in accordance with the following competitive principles:(A) The pipeline must provide open and nondiscriminatory access to both owner and non-owner shippers.
 
 
 83
 43 U.S.C. Sec. 1334(f)(1)(A).
 
 
 84
 Because the Commission had evidently not grasped the nature of the producers' argument, we remanded for it either to except gas carried on the OCS from the crediting mechanism, or to respond to the producers' claim. AGA I, 888 F.2d at 149. On remand, the Commission rested its authority to impose the crediting mechanism in the OCS primarily on two grounds: a savings clause in Sec. 5(f)(4), and its power to interpret "without discrimination" and "open and nondiscriminatory access" in Secs. 5(e) and 5(f)(1)(A), respectively. We believe its interpretive power is indeed enough.
 
 
 85
 We reject the Commission's view that Sec. 5(f)(4)'s savings clause necessarily imbues it with exactly the same discretion in the OCS as the NGA allows onshore. It provides simply:
 
 
 86
 Nothing in this subsection shall be deemed to limit, abridge, or modify any authority of the United States under any other provision of law with respect to pipelines on or across the outer Continental Shelf.
 
 
 87
 43 U.S.C. Sec. 1334(f)(4). With respect to Sec. 5(f), we question whether Congress intended the savings clause to merge Sec. 5(f)(1)(A)'s specific mandate with Natural Gas Act's vaguer bans on "undue preference[s]," "unreasonable difference[s]," and "unduly discriminatory" rates, classifications, etc. See NGA Secs. 4 & 5, 15 U.S.C. Secs. 717c(b), 717d(a). First, Sec. 5(f)(4) is specifically a savings clause only against sub section 5(f), and cannot save any FERC power as against Sec. 5(e). In any event, it would make little sense for the savings clause to wipe out an explicit prohibition contained in subsection 5(f), if there were one. If FERC's decision is to be upheld, then, it must be on the basis of its power to interpret the anti-discrimination clauses of Secs. 5(e) and 5(f)(1)(A).
 
 
 88
 No party before us disputes the Commission's power to interpret those mandates. See, e.g., High Island Offshore System, 14 FERC p 63,036 at 65,096-104 (1981) (ALJ interprets Sec. 5(f)(1)(A)'s "nondiscriminatory access" provision). Thus the question reduces to the reasonableness of the interpretation.
 
 
 89
 The producers argue that the plain meaning of "nondiscriminatory" precludes any restriction on producer access to OCS pipelines. But as we noted in AGD I, statutory bans on discrimination by natural monopolies have always allowed the regulatory agencies discretion to permit differing categories, including, for example, rate classifications based on customers' differing elasticities of demand. See AGD I, 824 F.2d at 1011 (citing cases). Here Congress expressly characterized Sec. 1334(f)(1)(A)'s open access mandate as one of several "competitive principles." See 43 U.S.C. Sec. 1334(f)(1). The Commission has created categories that in its view (which is uncontested as a matter of fact or policy) will advance the pro-competitive goal of its open access policy. It has thus given a meaning to Congress's anti-discrimination norm that fits the overall congressional purpose. This is neither a violation of law nor arbitrary or capricious.
 
 
 90
 D. Casinghead Gas.
 
 
 91
 Casinghead gas is gas "produced with oil from oil wells." Howard R. Williams, Oil and Gas Terms 120 (7th ed. 1987); compare "associated gas," id. at 58 (gas occurring in the form of a gas cap associated with an oil zone). A pipeline's failure to take it promptly jeopardizes a producer's efficient operation of a field, typically requiring it "either to shut in the oil production or flare the casinghead gas." See AGA I, 888 F.2d at 149 (quoting Order No. 500-C). The shutting-in of production may reduce the amount ultimately recoverable from the reservoir. III FERC Stats. & Regs. at 31,531. Because of this exigency, the Commission in Order No. 500-C excepted casinghead gas from the crediting mechanism. In AGA I, we remanded for the Commission to address an argument it had previously ignored, namely, that producers could avoid the waste of resources foreseen by the Commission simply by selling the gas on the open market. 888 F.2d at 149.
 
 
 92
 On remand, the Commission eliminated the exemption. It found that whereas at the start of its restructuring producers had lacked access to pipelines to carry released gas, open access transportation was now "much more widely available." III FERC Stats. & Regs. at 31,531. It therefore prospectively eliminated the casinghead gas exception, but provided for "blanket abandonment and certificate authority to permit the release and resale of the gas to others" for all so-called "must-take" gas, including casinghead gas. Id. It also required pipelines to give producers 60-days' notice before applying credits against a contract, in order to give producers enough time to scare up alternative buyers and transportation, and it provided a chance for them to seek emergency relief from the Commission. Id. at 31,708-09.
 
 
 93
 Producers argue, however, that their gas supplies remain in danger of being shut in because gas shifted from a take-and-pay contract to mere open access drops to the end of the line of claimants to pipeline capacity. If that is limited enough, producers will not be able to get their gas to market.
 
 
 94
 We recognize that the Commission's approach may not work 100% of the time. But that is hardly a reason for doing away with it altogether; few rules could survive that standard. Further, the Commission's provisions for notice and expedited relief seem apt to reduce the risks to a reasonable minimum. Producers offer no basis for us to second-guess the Commission here.
 
 
 95
 The producers also claim that far from extinguishing the casinghead gas exemption, the Commission should have extended it to all other "must-take" gas. The above analysis obviously dooms this broader contention.
 
 
 96
 E. "Double Crediting."
 
 
 97
 Under the crediting mechanism, a pipeline can demand credit for transporting gas that another pipeline has purchased from a producer. Producers claim this amounts to "double crediting," as purchase of the unit will also reduce the purchasing pipeline's take-or-pay liability.
 
 
 98
 In Order No. 500-H the Commission followed its conventional style of listing everybody's points at length but without analysis, and then dispatching the claims with a brief discussion. It mentioned the double-crediting argument, see III FERC Stats. & Regs. at 31,569, but never really responded to it, see id. at 31,570. The only arguably responsive remark is an observation that a purchasing pipeline's sales to customers in the transporting pipeline's sales market "could displace a sale of the [transporting] pipeline." Id. This, of course, is true, but it fails to explain why the rule does not in fact force producers to give two credits for one unit of gas sold. After all, the unit can only be used once; that one use would seem to state the aggregate amount of displacement. If the unit displaces a sale the transporting pipeline would have made, then perhaps it has been diverted from the purchasing pipeline's usual market, opening up potential for a sale there. In any event, though the true displacement caused by sale of a fungible commodity is necessarily obscure (if not in fact an arbitrary concept), we return to the point that the same unit can be used only once.
 
 
 99
 The rule here seems particularly puzzling because the producer has no say over which pipelines will transport the gas. This appears to provide rich opportunities for mutual back-scratching among pipelines--to arrange for transporting of each other's gas for the purpose of generating credits.
 
 
 100
 There may well be a good answer to all this (for instance, there may be some good reason to exclude performance under a contract from the concept of a credit), but the Commission has not disclosed it intelligibly enough for us. If it wishes to maintain this part of crediting, it must on remand address the producers' concerns head-on.
 
 IV. Pregranted Abandonment
 
 101
 In Order No. 436 the Commission provided "pregranted abandonment," at the end of the contract term, for every "individual transportation arrangement authorized under a certificate granted under this section [authorizing "blanket" certificates]." 18 CFR Sec. 284.221(d) (1989). Without pregranted abandonment, a pipeline would have been legally bound to make any such service available indefinitely, despite expiration of the contract, until it received individual Commission approval under Sec. 7(b) of the Natural Gas Act, 15 U.S.C. Sec. 717f(b).
 
 
 102
 Although no one challenged pregranted abandonment in AGD I, this court vacated it along with the rest of Order No. 436 because Commission errors in other areas had "taint[ed] the package." 824 F.2d at 1044. On remand, the Commission in Order No. 500 (and 500-H) repromulgated Sec. 284.221(d) without change. After issuance of Order No. 500, it construed Sec. 284.221(d) to encompass "conversion transportation": transportation arising out of sales customers' exercising their right to convert purchase arrangements into transportation, a right created originally in Order No. 436 and renewed in Order No. 500. See Transco, 44 FERC p 61,105 (1988).[5] In Order Nos. 500-H and -I the Commission adhered to the view that Sec. 284.221(d) covered conversion transportation, offering only the most oblique explanation of why transportation under a converted individualized sales certificate fell within the language of Sec. 284.221(d)--"transportation arrangement authorized under a certificate granted under this section." (Section 221 does not provide for conversion transportation; it appears in Sec. 284.10.) See III FERC Stats. & Regs. at 31,730.
 
 
 103
 This time around, several parties challenged pregranted abandonment as an abdication of the Commission's responsibilities under Sec. 7 of the NGA and as unsupported by reasoned decisionmaking. They attack it especially in the context of conversion transportation.
 
 A. Jurisdiction
 
 104
 The Commission claims that we have no jurisdiction to hear petitioners' arguments because they constitute an impermissible collateral attack on Order No. 436, on which the 60-day time limit provided in 15 U.S.C. Sec. 717r(b) has long since expired.
 
 
 105
 We find this clearly without merit as to conversion transportation. The Commission recognizes that under such cases as Raton Gas Transmission Co. v. FERC, 852 F.2d 612, 615 (D.C.Cir.1988), and RCA Global Communications, Inc. v. FCC, 758 F.2d 722, 730 (D.C.Cir.1985), we will hear attacks on an agency regulation, despite expiration of statutory time limits, if the agency did not "reasonably put[ ] aggrieved parties on notice of the rule's content." Here, not only does the language of Sec. 284.221(d) appear only tenuously related to conversion transportation, but the Commission's construction is somewhat inconsistent with its statement, in the preamble to Order No. 436, that conversion from firm sales to firm transportation would in no way alter the "quality or priority" of the transportation service. Order No. 436, FERC Stats. & Regs. [Regs. Preambles], p 30,665 at 31,517. Even the Commission views Order No. 500-H as having "clarified" Sec. 284.221(d), III FERC Stats. & Regs. at 31,583, and it justified this clarification at some length, see id. at 31,727-35. To treat converting sales customers as barred by their inaction against Sec. 284.221(d) in its original incarnation would allow unconscionable sandbagging.
 
 
 106
 The issue is closer with regard to transportation other than that converted from sales. We have permitted challenges to regulations outside statutory time limits if the agency has reopened an issue. See State of Ohio v. EPA, 838 F.2d 1325, 1328-29 (D.C.Cir.1988); Association of American Railroads v. ICC, 846 F.2d 1465, 1473 (D.C.Cir.1988). Order No. 500-H does not address the issue of the permissibility of pregranted abandonment generally, but parties seeking rehearing of that order did so, and the Commission, far from treating the matter as settled from Order No. 436, responded in full on the merits. Much of the discussion drew no distinction between conversion and other transportation, and in view of that intermingling we conclude that the reopening principle of State of Ohio is applicable.
 
 
 107
 We leave to another day the effect of the vacation of an order (Order No. 436) and the agency's inclusion of an unchallenged component (Sec. 284.221(d)) in its promulgation of a revised version of the original order. As no attack was made on Sec. 284.221(d) in the challenges to the original promulgation, and as it was a forgone conclusion that after Order No. 436's vacation the Commission would resurrect the basic policy decision inherent in the order, one might question whether challengers should get a second crack at Sec. 284.221(d) through the fortuity of the broad remedy chosen in AGD I. Here, even assuming a negative answer to that question, our cases require us to reach the merits.
 
 
 108
 B. The Merits.
 
 
 109
 Petitioners'[6] attacks on pregranted abandonment take essentially two forms. The first, phrased as a claim that the rule "[writes] Section 7(b) out of the Act," is essentially an argument that any rule permitting abandonment on the expiration of contracts effectively delegates the abandonment decision to the pipeline and is therefore an unlawful abdication of Commission responsibilities under Sec. 7(b). The second is that, assuming that the Commission may (in some or all instances) make abandonment automatic on contract expiration, it has not adequately justified its doing so here. We reject the first claim and accept the second.
 
 
 110
 1. Decision illegally delegated to pipeline. First, we note that petitioners quite rightly, and necessarily, concede that the Commission may decide on abandonment in advance, even before service has begun, see FPC v. Moss, 424 U.S. 494, 501, 96 S.Ct. 1003, 1008, 47 L.Ed.2d 186 (1976), and that it may make such a determination generically, covering an entire class of cases, see Joint Initial Brief of Indicated LDCs, State Commissions, State Agencies, and End Users, on Issue of Pregranted Abandonment of Firm Service at 8; see also AGD I, 824 F.2d at 1015 n. 17; 18 CFR Sec. 157.30(c), Sec. 157.301 (1989) (providing for pregranted abandonment of gas sold for resale by a producer upon expiration of the contract).
 
 
 111
 Petitioners rest the idea that contract expiration may not be the triggering event on United Gas Pipe Line Co. v. McCombs, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979). The court of appeals, on the theory that apparent exhaustion of reserves automatically and necessarily effected abandonment for Sec. 7(b) purposes, had overturned a Commission decision rejecting that notion and insisting that reserves remained dedicated to interstate commerce until the Commission granted abandonment. The Supreme Court reversed, thus protecting the Commission's opportunity to determine whether the exhaustion had in fact occurred. Id. at 535-39, 99 S.Ct. at 2465-67. In the course of the opinion the Court observed that treating apparent exhaustion as a legal abandonment would vest the abandonment decision "in the producer's control, a result clearly at odds with Congress' purpose to regulate the supply and price of natural gas." Id. at 539, 99 S.Ct. at 2467. Here, of course, the Commission has exercised its authority over abandonment (in advance and generically, to be sure), so the holding is not pertinent.
 
 
 112
 The 5th Circuit has recently given McCombs a broad reading, finding it to prohibit the Commission from pregranting abandonment of producer sales of gas to pipelines in the event producer and pipeline do not reach agreement after a "good faith negotiation" conducted pursuant to certain Commission ground rules. Mobil Oil ExMploration and Producing Southeast, Inc. v. FERC, 885 F.2d 209, 221-23 (5th Cir.1989), stay granted, --- U.S. ----, 110 S.Ct. 830, 107 L.Ed.2d 826 cert. granted, --- U.S. ----, 110 S.Ct. 2585, 110 L.Ed.2d 266 (1990). The court may have reached this conclusion because only a producer could initiate the negotiation process, 885 F.2d at 217, so it would occur only if the producer saw a prospect of a net price increase; the court evidently did not find in the Commission's discussion an adequate explanation of how the process as a whole was consistent with the NGA's consumer-protection purposes. As to McCombs more generally, even if we read Sec. 7(b) as prohibiting abandonment at the unconstrained election of a natural gas company, the present rule does no such thing. It provides for abandonment only at the expiration of an agreement between the pipeline and customer. We see neither Mobil Oil nor McCombs as a barrier to pregranted abandonment in that circumstance, so long as the Commission supports it with proper reasoning.
 
 
 113
 2. Reasoned decisionmaking. The local distribution companies' basic complaint is that allowing pipelines to terminate transportation service on expiration of the applicable contracts violates the Commission's duty to protect consumers by endangering the LDCs' ability to guarantee their customers a steady supply of gas. The importance of continued service, they argue, is embedded in Sec. 7(b) of the NGA, which prohibits any natural gas company from discontinuing certificated service (even after the underlying contract expires) until the Commission determines that abandonment is in the public convenience and necessity. Thus in Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 143, 80 S.Ct. 1392, 1396, 4 L.Ed.2d 1623 (1960), the Court found Sec. 7(b) rooted in a congressional concern that with pipeline freedom to terminate "a local economy which had grown dependent on natural gas as a fuel would be at [the pipeline's] mercy." See also McCombs, 442 U.S. at 536, 99 S.Ct. at 2466; Sunray Mid-Continent Oil Co. v. FPC, 239 F.2d 97, 101 (10th Cir.1956) ("No single factor in the Commission's duty to protect the public can be more important to the public than the continuity of service furnished."). Recognizing that even a monopolist with the capacity to provide a service will do so at a price, the LDCs go on to argue that they will be able to secure continued service only by yielding to monopolistic demands. Cf. Sunray Mid-Continent, 364 U.S. at 143, 80 S.Ct. at 1396 (referring to "great economic power of the pipeline companies"). As the Commission controls the terms on which transportation is supplied, they suggest that this pipeline pressure may take the form of insisting on special advantages in matters not covered by the pipeline's tariff, see, e.g., R. 12211-12 (reproduced in Joint Appendix Vol. VII), or extracting a customer's agreement to forgo challenges to the prudence of the pipeline's costs, see Joint Initial Brief of LDCs et al. on Issue of Pregranted Abandonment of Firm Service at 24 n. 20.
 
 
 114
 The Commission's response to this takes two forms--a denial that its rule will have the feared effect on pipeline customers, and assertion of a variety of policy arguments that might justify exposing them to the risk of the effects anyway. Neither component of the response appears very persuasive. The Commission's denial never directly responds to the suggestion that pregranted abandonment--in the broad form provided here--would allow pipelines indirectly to extract monopoly profits from their customers. Perhaps the answer is that no regulatory system can really provide that protection--that market power is irrepressible, as Shakespeare's Rosalind says of women's wit: "Make the doors upon a woman's wit, and it will out at the casement; shut that, and 'twill out at the keyhole; stop that, 'twill fly with the smoke out at the chimney." As You Like It, IV, 1, 148-51. See also William A. Niskanen, Natural Gas Price Controls: An Alternative View, Regulation at 46 (Nov/Dec 1986). Whatever the truth of such a theory, it appears inconsistent with the congressional assumption that Commission control over certain critical features, including termination of service, could materially offset the effects of monopoly. Alternatively, perhaps the Commission be Mlieves the opposite--that it can readily cure any such efforts to exploit market power. In any event, the Commission did not offer any direct response.
 
 
 115
 At points the Commission seems to be arguing that the LDCs have ample alternatives--interruptible transportation, "standby" gas service from the terminating pipeline, or gas supplied by other pipelines--, so that there is, in effect, no pipeline monopoly to be feared. III FERC Stats. & Regs. at 31,728-29. But interruptible and standby service are palpably inadequate for LDCs' longterm needs, as they are likely--probably certain--to be unavailable during the peak winter months. As to alternative pipelines, the Commission has made no finding that these are available (to an extent that would seriously constrain pipeline market power) for most, much less all, of the customers; indeed, in Order No. 436 it successfully asserted the exact opposite. See AGD I, 824 F.2d at 1017-18.
 
 
 116
 The Commission also argues that pregranted abandonment, even for conversion transportation, has such desirable effects--relevant to the purposes of the NGA--as to justify whatever risks it may pose of abuse of market power. First it says that pregranted abandonment helps assure that pipeline capacity will go to those who value it most. Without it, "the capacity needed by other purchasers ... may never practically become available." III FERC Stats. & Regs. at 31,584, 31,728. It is surely true that capacity dedicated to one customer cannot be available to others until undedicated. But as the Commission requires that pipeline transportation capacity be allocated on a first-come, first-served basis, Order No. 436, FERC Stats & Regs. p 30,665 at 31,515 (1985), it is hard to see how displacement of an existing customer has much prospect of shifting the capacity to a user that values it more highly; getting into line early is not necessarily evidence of high valuation. The usual device for allocations in accordance with value is price--i.e., value measured by willingness to pay.[7] While the Commission's goal here is commendable, and while it is by no means its fault that the NGA's rate regulation requirements may complicate any efforts to use price to clear the market for capacity, the point still remains that pregranted abandonment, if coupled with first-come-first-served allocation, can't get it much of the way toward allocation in accordance with value.
 
 
 117
 FERC also argues that pregranted abandonment "helps ensure that capacity will not be retained by existing customers if it is not needed by them, and ... gives customers an incentive to accurately nominate the length [of] their contracts." See III FERC Stats. & Regs. at 31,728. We fail to see how pregranted abandonment accomplishes this. Surely the primary determinant of whether a customer will hold onto excess capacity rights is price, specifically the size of demand charge and the degree to which it is related to peak-period use. If it is too low, parties will sign up for capacity (through the first-come-first-served device, if that is the one provided) without full regard to opportunity cost--the value foregone by the capacity being unavailable to others. If price matches opportunity cost, they will not. In this context, then, pregranted abandonment seems at most only to switch the incidence of the excess capacity from one user to another.
 
 
 118
 As to conversion transportation--where the LDCs' attack is fiercest--the Commission asserts that here pregranted abandonment presents no problem because the LDCs could always have remained sales customers. But their having to remain so (in order to be sure of supplies) would disable them from using gas supplied by others--or the realistic threat of turning to such gas--to put pipelines under pressure to keep prices competitive, which was the fundamental idea of open access. Thus the Commission's response seems to entail an enormous qualification of its basic purpose. Of course an agency can pursue a goal without being absolutely gung-ho, but for it to justify universal pregranted abandonment, which is lightly supported on the present record, on the grounds that it will do no harm to a customer that gives up the benefits of the restructuring program, does not much advance its argument. Moreover, the argument does not take account of the customers who converted before they were on notice that their transportation would not be as secure as the converted sales, despite the Commission's apparent promise to the contrary. See text above at 1514.
 
 
 119
 By way of mitigation of Sec. 284.221(d), the Commission has committed itself to considering necessary deviations from pregranted abandonment in individual GIC and rate and service proceedings, or in response to individual complaints. III FERC Stats. & Regs. at 31,728. Indeed, it cites specific instances in which it has already determined that a factual inquiry is necessary to determine whether a pipeline might be able to use its monopoly power to LDCs' detriment. Id. at 31,731. While such a safety valve can help secure the validity of a basically sound rule, see, e.g., the treatment of casinghead gas in the crediting mechanism, above at 1513, it cannot save one so poorly supported as this.
 
 
 120
 C. Conclusion.
 
 
 121
 As in any case of unreasoned decisionmaking, we do not mean to suggest that the Commission is without power to implement pregranted abandonment. In FPC v. Moss, 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976), for instance, the Commission successfully defended limited-term certifications on the basis that its goal of stimulating increased production outweighed one of the basic features of natural gas regulation up to that point--that producers were bound to continue to supply gas beyond the terms of the contract until the Commission granted abandonment in an individualized proceeding occurring at the time of the producer's attempted end of service--and the policies behind that tradition. Here, the Commission has not yet adequately explained how pregranted abandonment trumps another basic precept of natural gas regulation--protection of gas customers from pipeline exercise of monopoly power through refusal of service at the end of a contract period.
 
 
 122
 We remand the case to the Commission for reconsideration of this point. We refrain from a reversal of Sec. 284.221(d) because all parties appear to agree that it makes sense for some transportation arrangements. There is, for example, no claim that it is at all troubling as to interruptible service; it would make no sense for us to bring that even temporarily to an end. The same may well be true of a wide range of short-term transportation arrangements. But it is the Commission, not us, that can identify those transactions for which pregranted abandonment is most suitable, assuming it is to apply to less than the entire universe. However, lest customers be cut off from supplies or otherwise subjected to pipeline market power under an insufficiently supported rule, we require that the Commission address the matter in a final rule within 90 days.
 
 V. Miscellaneous Claims
 
 123
 A. Contract Demand Reduction.
 
 
 124
 As part of Order No. 436, the Commission provided that any sales customer of an open access pipeline could at its option reduce its contractual obligation to purchase gas (its "contract demand" or "CD"). In AGD I, we held that the Commission had failed to develop an adequate rationale in support of this option. 824 F.2d at 1018-20. On remand, although sticking to its guns as a policy matter, III FERC Stats. & Regs. at 31,580-81, the Commission decided not to repromulgate a generic customer entitlement to CD reduction, choosing instead to approach it case-by-case, id. at 31,582. It reasoned that this would allow it to tailor any remedy to the facts such as the likelihood of its inducing rate reductions, risks of cost-shifting to captive customers, and correspondence with actual customer demand. Id. at 31,581-82; see also id. at 31,724-27.
 
 
 125
 Some petitioners argue that because the Commission on remand reiterated its belief that CD reduction is sound policy (and had claimed in Order No. 436 that CD reduction was "essential" to open access), its decision not to act across the board is arbitrary and capricious. But agency discretion is at its peak in deciding such matters as whether to address an issue by rulemaking or adjudication. See SEC v. Chenery Corp., 332 U.S. 194, 201-03, 67 S.Ct. 1575, 1579-80, 91 L.Ed. 1995 (1947); NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). The Commission seems on especially solid ground in choosing an individualized process where important factors may vary radically from case to case. This discretion remains even when the argument for generic CD reduction in a particular context appears very strong, such as when a pipeline bypasses an LDC and sells directly to an end user.
 
 
 126
 B. Take-or-pay Cost Passthrough.
 
 
 127
 1. Sunset date. In Order No. 500 and its successors, the Commission established, and extended, a sunset date after which pipelines would not be allowed to file under its "equitable sharing" mechanism for passing through to customers the costs of take-or-pay buyouts and buydowns. In AGA I, we invalidated the sunset date because it forced a pipeline to choose that mechanism (at the expense of possible pursuit of others) before securing judicial review of its adequacy. See 888 F.2d at 151. The court was also concerned that even a sunset date falling after completion of review would not allow a pipeline to file alternative recovery proposals, and appeal the Commission's rejection, without foregoing its ability to participate in the Commission's chosen mechanism. Id.
 
 
 128
 In Order Nos. 500-H and -I the Commission established a December 31, 1990 sunset date (with an extension until 30 days after completion of review if this case were pending on that date) "for the alternative passthrough mechanism." III FERC Stats. & Regs. at 31,533; see also id. at 31,721 (sunset date "for the alternative, equitable sharing mechanism"). In AGD II, 893 F.2d 349 (D.C.Cir.1989), however, we struck down that mechanism as a violation of the filed rate doctrine. The full court has declined to rehear the case en banc, 898 F.2d 809 (D.C.Cir.1990); we (the panel) granted a stay of the mandate to allow the Commission to consider pursuit of certiorari in the Supreme Court, and it has in fact filed for certiorari. 59 U.S.L.W. 3017 (U.S. June 21, 1990) (No. 89-2016).
 
 
 129
 At this point, therefore, there is nothing for us to decide. Should AGD II remain good law, the Commission will have to start over if it wants to adopt another passthrough mechanism. The Commission's language does not suggest that it intended to apply the December 31, 1990 sunset date to any recovery proposal it should develop. Pipelines could challenge such a novel reading on appeal of a new recovery proposal. Should the Supreme Court overturn AGD II, then any party aggrieved by the new sunset date can challenge its validity. Until that happens, however, we see no reason to review a time limit for use of an invalid rule.
 
 
 130
 2. Opportunity to recover prudently incurred costs. Several petitioners claim that the passthrough mechanism adopted in the Order No. 500 series unlawfully denies pipelines a reasonable opportunity to recover prudently incurred costs. As we invalidated that mechanism from a rather different perspective in AGD II, 893 F.2d at 354-57, on the ground that it violated the filed rate doctrine, we have no passthrough mechanism before us and such claims are unripe.
 
 
 131
 3. Continued use of passthrough mechanism. Implicit in our stay of the AGD II mandate was a decision that the Commission could wait until judicial review was complete before complying with our decision. Grant of some petitioners' demand that we order an end to the Commission's use of the mechanism in the meantime would be inconsistent with that earlier judgment. Our mandate will issue when the review process comes to a complete end; the Commission may wait till then to unscramble the equitable sharing egg.C. Passthrough at the State Level.
 
 
 132
 Some parties complain that the Commission issued what they view as "gratuitous dicta" on state regulators' options for ensuring that LDCs shoulder a portion of the take-or-pay costs passed through to them. III FERC Stats. & Regs. at 31,723. On petitioners' own characterization, we have no jurisdiction to review these remarks. See Office of the Consumers' Counsel, Ohio v. FERC, 808 F.2d 125, 128-29 (D.C.Cir.1987). The only possible injury LDCs have suffered--that state agencies might defer excessively to FERC's remarks--is not challengeable here but in the relevant state proceedings.
 
 VI. Conclusion
 
 133
 We conclude that the Commission has adequately explained why no further steps--Sec. 5 action, an enhanced crediting mechanism, or any other--are necessary in order to solve the take-or-pay problem or address the effect of open access on the pipelines' bargaining power vis-a-vis producers. We uphold the orders under review, remanding the case only for want of reasoned decisionmaking on pregranted abandonment and so-called "double crediting."
 
 
 134
 So ordered.
 
 
 
 [1]
 As noted at page 1508 below, the Commission affirmatively found that it could not make any generic finding that any one take-or-pay level was unjust or unreasonable, and that making contract-by-contract assessments would be administratively difficult. We reject any claim, to the extent that petitioners may be making one, that the embryonic inquiry necessary to reach these negative conclusions somehow exposed the Commission to closer scrutiny
 
 
 [2]
 The inner quote "subject to the jurisdiction of the Commission" comes from Sec. 206 of the Federal Power Act, 16 U.S.C. Sec. 824e (1988), but is exactly the same phrase as appears in the parallel passage of Sec. 5 of the NGA
 
 
 [3]
 We uphold the Commission's decision not to release the raw data about individual settlements it compiled in deciding whether to take action under Sec. 5. It had agreed not to do so because of some parties' expressions of concern about the competitive effect of release. See 18 CFR Sec. 388.112 (1989). Only AGD moved for rehearing on the issue, which the Commission denied separately after Orders 500-H and 500-I had already been appealed. AGD's appeal to this court (docketed as No. 90-1264) was consolidated with this complex case and AGD agreed "to let the issues raised in No. 90-1264 be governed by the briefs already submitted." Motion to Consolidate of Petitioner Associated Gas Distributors, No. 90-1264, filed May 22, 1990, at 3
 The briefs arguing for disclosure of the raw data point to no cases supporting their claim of a "clear violation of due process" or otherwise supporting release. (In fact, they point to no case law at all.) Their only real argument is that the pipelines that provided the information had an incentive to overestimate the amount of potential exposure they resolved in order to make the amount they wish to pass downstream seem more reasonable. The Commission's response to this point seems well-founded: that incentive would be balanced by the pipelines' desire to make cost look high relative to relief afforded so as to strengthen the case for Commission action under Sec. 5.
 
 
 [4]
 Petitioners limit their attack here to the contracts governed by Sec. 7 of the NGA as we have already approved, in AGA I, 888 F.2d at 149, the Commission's authority to promulgate the crediting mechanism under contracts governed by Sec. 311 of the NGPA
 
 
 [5]
 The Commission in Order No. 500-H also made abandonment of sales service automatic on customer conversion to transportation, on the ground that the customer was no longer paying a sales demand charge, and that abandonment would better enable pipelines to estimate their supply needs. It regarded these advantages as overcoming the resulting slight diminution in customers' security of supply. III FERC Stats. & Regs. at 31,584. We reject the LDCs' weakly urged contention that this decision is unreasoned
 
 
 [6]
 Those attacking pregranted abandonment are a group of local distribution companies, state commissions, state agencies, end users and a natural gas marketer. For simplicity's sake, we refer to them collectively as LDCs
 
 
 [7]
 Converted sales customers are initially placed at the head of the line, id. at 31,517, but presumably get bumped to the end if they fail to negotiate successfully with pipelines once the converted sales contracts expire